IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STEVE STRAUSS d/b/a CLASSIC TREE CARE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| ANGIE'S LIST, INC., | ) ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Steve Strauss d/b/a Classic Tree Care (hereinafter referred to as "Strauss" or "Classic Tree") and on behalf of himself and all other persons similarly situated, alleges and states as follows:

## PARTIES AND JURISDICTION

1.     Plaintiff Strauss is a citizen and resident of the state of Kansas and at relevant times has conducted business as an arborist in the state of Kansas under the trade name and style "Classic Tree Care".

2.     Defendant Angie's List, Inc. ("Angie's List") is a corporation organized and existing under the laws of the state of Delaware having its principal place of business in Indianapolis, Indiana and is licensed to do business and doing business, in fact, in the state of Kansas.

3.     This Court has original, subject matter jurisdiction with respect to this action and over each and all of the claims asserted herein pursuant to 28 U.S.C. §§ 1332(a) and/or 1332(d) for the reasons that this is:

a.    An action between a citizen of Kansas and a citizen of Delaware/Indiana wherein, as alleged in ¶ 53 hereinbelow, the plaintiff asserts claims against Angie's List for, *inter alia*, actual damages in an amount exceeding the sum of $100,000, exclusive of interest and costs and otherwise in an amount to be determined by the trier of fact; and/or

b.    An action wherein at least one of the members of the proposed class or classes is a citizen of a state different from those of which Angie's List is itself deemed to be a citizen and an action wherein the aggregate claims of all putative class members exceed the sum of $5,000,000, exclusive of interest and costs:

i.    As alleged in ¶ 69(b) hereinbelow, one of the proposed classes of plaintiffs consisting of "Service Providers" who have paid advertising and/or referral fees to Angie's List totals fully 55,644 persons;

ii.    As alleged in ¶ 61 hereinbelow, in the year ended 12/31/14, Angie's List received fully 76.8% of its total revenues from such "Participating Service Providers";

iii.    As alleged in ¶ 53 hereinbelow, Strauss, who is/has been one of these 55,644 "Service Providers" has alone suffered in excess of $100,000 in actual damages as a result of the wrongful conduct which is the basis for this proposed class action.

4.    Angie's List is subject to service of process and to the exercise of personal jurisdiction herein for the reasons that, *inter alia*:

a.    Angie's List has transacted business in the state of Kansas within the meaning of K.S.A. § 60-308(b)(A), out of which the claims of Strauss and/or the claims of one or more of the classes proposed herein arise;

b.    Angie's List has committed tortious acts in the state of Kansas within the meaning of K.S.A. § 60-308(b)(B) for the reason that the breaches of duty, violations of statute and/or unfair and deceptive acts or practices which are the subject of Strauss's claims and the claims of the members of one or more of the classes proposed herein were known by Angie's List to have, were expected to have, were intended by Angie's List to have and have had, in fact, the effect of injuring Strauss and the members of one or more of the classes proposed herein in the state of Kansas;

c.    Angie's List possesses and maintains contacts with the state of Kansas of a kind and character sufficient to support *in personam* jurisdiction over it, consistent with the constitutions of the United States and of the state of Kansas within the meaning of K.S.A. § 60-308(b)(L); and

2

d. Angie's List has otherwise engaged in substantial, continuous and systematic contact with the state of Kansas of a kind and character sufficient to support the exercise of *in personam* jurisdiction over it, consistent with the constitutions of the United States and of the state of Kansas.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 for the reason that Angie's List is subject to *in personam* jurisdiction herein and for the reasons that Angie's List regularly conducts business in this district; that Strauss and other members of one or more of the classes proposed herein reside in this district; and that a substantial part of the acts, events, omissions or occurrences giving rise to such claims, as alleged in this Complaint, occurred in this district.

## NATURE OF THE CASE

6. Angie's List is an advertising business, rating and endorsement service having fee-paying advertisers as well as fee-paying "members" which, through written materials published electronically on the internet, purports to allow consumers of goods or services to themselves post their own commentaries, ratings and endorsements respecting persons or entities such as plumbers, contractors, dentists, mechanics, etc. from whom they have received goods or services ("Service Providers"). All such consumer-generated commentaries, ratings and endorsements are published upon and accessible by other consumers and the public through an internet website owned and maintained by Angie's List denominated www.angieslist.com ("Angie's website").

7. This is a civil action for monetary damages, injunctive and other relief arising from Angie's List's unfair, false and deceptive advertising as well as its other, related, unfair, false or deceptive acts and/or practices, the aggregate effect of which is to deceive its members, advertisers, consumers and the public into believing falsely:

3

    a.       That the commentaries and endorsements which it has published and continues to publish on the Angie's website are unfiltered, substantially unedited and all-inclusive consumer-prepared commentaries and endorsements; and

    b.       That all ratings and/or comparative rankings of Service Providers which appear on the Angie's website were and are the objective and arithmetic product of such unfiltered, substantially unedited, all-inclusive and unaltered consumer-prepared commentaries and endorsements.

8.      In truth and in fact Angie's List manipulates the "list" or "rankings", by order of appearance, of Service Providers identified in the context of consumer searches of the Angie's website, both with regard to the inclusion, *vel non*, of Service Providers in the List and the position/prominence with which such Service Providers are listed.

9.      Angie's List manipulates such List in exchange for payments made to it by Service Providers, all of which is concealed from other advertisers, members, consumers and the general public.

10.      Angie's List falsely, fraudulently and deceptively assures its advertisers, its members, consumers and the general public that a Service Provider's relative position/ ranking/prominence in the "list" of providers which is the ultimate product of a search by consumers of the Angie's website "is determined by their recent grades and numbers of reviews" by consumers and that the Service Provider "with the best ratings from members will appear first".[1]

11.      Through its own published advertising statements and promotion of its business and services, Angie's List has represented falsely, fraudulently and/or deceptively that:

    a.       "[c]ompanies cannot pay to be on Angie's List";

    b.       Service Providers "don't pay" to be on Angie's List;

---

[1] *See* Angie's List FAQ, "Understanding and Sorting Search Results" at https://www.angieslist.com/faq/ understanding-and-sorting-search-results/ (updated February 8, 2017) (last accessed September 12, 2017).

c.  Angie's List and its business are driven by a purported "consumer first philosophy"; an "unwavering commitment" to place "the interests of the consumer first" and the single objective of enabling those consumers who access the Angie's website or otherwise make inquiry of it to find the "best" Service Provider for their service needs;

d.  Angie's List "simply acts as a passive conduit" for consumer endorsements and that all reviews, ratings and rankings that appear on its website with respect to a Service Provider are "based upon actual first-hand experience other users" of that Service Provider "have had"; and

e.  Angie's List itself "does not endorse" any Service Providers.

12.  Angie's List falsely, fraudulently and deceptively conceals the fact that Service Providers are able to pay, encouraged by Angie's List to pay and in fact pay substantial "advertising" and "referral" fees to Angie's List, which, when received, have controlling influence upon the inclusion and the positioning of the Service Provider in the published "lists" of Service Providers appearing on the Angie's website.  In truth and in fact:

a.  Service Providers can and do pay substantial advertising fees to Angie's List in order to appear "higher", more prominently, or ranked more favorably in Angie's List than actual consumer comments, reviews and endorsements of their goods and services would support;

b.  Angie's List claims, falsely, that any consumer or other person who chooses to search the Angie's website for a provider of goods or services will, as the product of that search, be presented with a list of all nearby providers and all reviews, commentaries and endorsements by Angie's List's members for those Service Providers, whether favorable or unfavorable, as well as each Service Providers' "ratings" as expressed by the letters "A" which would be ascribed to the best Service Provider or providers through "F" which would be ascribed to the poorest Service Provider or providers;

c.  If Angie's List's published statements, marketing and advertisements are to be believed, as they are in fact believed by consumers and the general public, these rankings will be ascribed to a given Service Provider based solely upon objective consumer reviews by actual users of such provider's goods/services and, as a consequence, that those Service Providers who in fact have received the most positive reviews and endorsements by consumers will have the highest ratings, ranking position and prominence on the published "list" of Service Providers;

d.    Angie's List falsely, fraudulently and deceptively alters the ranking, order and relative position and thus the visibility and prominence of the Service Providers that are listed and depicted in response to searches by consumers of the Angie's website;

e.    Angie's List ranks Service Providers higher than their competitors based on how much they pay it in advertising and referral fees, such that a Service Provider who qualifies for an "A" rating and has uniformly positive consumer reviews but who did not pay any "advertising" or other fees to Angie's List will and would be ranked lower than a Service Provider who did pay such fees to Angie's List but has demonstrably less favorable reviews, ratings and consumer endorsements;

f.    One investigative report published by Forbes Magazine revealed that an air conditioning company doing business in a given locality which, according to the Angie's website, had received the most favorable reviews from consumers was nonetheless ranked below eleven other providers of the same goods/services, all of whom had inferior ratings or just a handful of reviews.[2]  Forbes determined that the higher ranked companies paid $12,000 to $15,000 to appear higher on the List[3];

g.    A different Service Provider, who was stuck on the eighth page of results, was allegedly quoted $50,000 by Angie's List to be ranked higher in search results[4];

h.    Another investigative report found that: "If you're looking for a contractor, you're only going to look at the first page or two.  That skews the ratings.  I don't think they're being straight with the public on that"[5];

i.    Further, when consumers elect to use Angie's List call center instead of the Angie's website, Angie's List employees will refer them to a Service Provider, but the provider will be chosen from a list of only four such providers, none of whom has been chosen based on consumer reviews or ratings;[6]

j.    Angie's List also extorts "advertising" fees from Service Providers by threatening that they will be "buried" on the Lists published on the

---

[2] "Ain't It Time To Say Goodbye to Angie's List?", Forbes (Oct. 9, 2013).

[3] *Id*.

[4] *Id*.

[5] "The Boss Responds: A Call to Angie's List is Answered by Angie Herself", Santa Barbara Independent (July 19, 2014).

[6] Angie's List Marketing Guide, p. 6, available at http://content.angieslist.com/company/images/sp/almarketingguide.pdf (last accessed September 12, 2017)

Angie's website unless the Service Provider pays the requested amount to appear more prominently in the search results, or has purchased related services and advertising from Angie's List, thus distorting the integrity of search results by consumers;

k.    In addition, Angie's List employs a purported "dispute resolution" process designed, purportedly, to address consumer complaints regarding the goods or services received from "listed" Service Providers which in truth and in fact can or will result in the deletion of such consumers' reviews from a Service Provider's profile upon "resolution", thus depriving advertisers, consumers and the general public of the value and benefit promised by Angie's List in the form of allegedly genuine, unedited and unfiltered consumer feedback and content;

l.    The cumulative effect of this "rigging" of the Lists injures all services providers of the same or similar goods and services by virtue of the fact that consumer approval, satisfaction and approbation has been ascribed to "listed" competitors who have, in fact, paid for that approbation and may not actually have merited it, based upon actual consumer experience with their goods or services;

m.    Because of these misleading and deceptive acts, members do not know, or cannot reasonably discover, the collective membership's true, unfiltered assessment of a given Service Provider.

### ALLEGATIONS COMMON TO ALL COUNTS

**A.    Angie's List's Relationship With Its Members, Consumers and the Public**

13.    In the period immediately following its establishment in 1995, Angie's List collected and shared reviews and consumers' ratings of Service Providersby means of the telephone and door-to-door query and dialogue.  Angie's List has since become one of the leading, if not the largest electronic consumer rating service and electronic advertiser of consumer services of its kind; it has branded and represented and continues to brand and represent itself as a grass roots, web-based service unaffected and unshaped by influence outside of the true and genuine opinions/ reviews of its members.  This is an important and material reason why consumers use, and members pay to join Angie's List; and Angie's List's currently boasts a membership of over three million paying members.

14.     Angie's List made an initial public offering of its common stock in November 2011 and has since grown every year since its initial beginning. Angie's List reported $315 million in revenue for fiscal year 2014, up nearly 30% compared to fiscal year 2013.  The company reported $245.6 million in revenue for fiscal year 2013, up 58% compared to fiscal year 2012.

15.     Angie's List deceives, defrauds, and misleads consumers by manipulating what are purported to be exclusively consumer-driven search results, rankings and other consumer-generated content. These wrongful acts violate the principles set forth in the FTC guidelines on advertising and endorsements, as they appear in 16 C.F.R. Part 255 since, as a practical matter, Angie's List does not help members find the "best" Service Provider, but rather the provider who pays the most money to Angie's List to market, advertise and promote its goods and services.

16.     Angie's List requires all consumers who become members, and thus acquire full access to its Angie's website and its other publications and materials, to agree to a written Membership Agreement.

17.     The Membership Agreement describes the company's service as follows:

**I. ANGIE'S LIST SERVICE**
Angie's List provides reviews and ratings on a variety of Service Providers based upon the actual first-hand experiences other users have had with these Service Providers and also provides You with the opportunity to provide Your own reviews and ratings on the Service Providers You use.

18.     In the context of national advertising by various media, Angie's List encourages and induces consumers to believe that the product of a search on Angie's website and the rankings of Service Providers depicted in such searches are based upon unfiltered and unalloyed reviews drafted by actual consumers respecting goods and/or services actually received from the Service Provider that/who is the subject of such consumer review.  In furtherance of this

campaign of deception and manipulation, Angie's List declares in its Membership Agreement with consumers, that:

a.  It "simply acts as a passive conduit" for reviews and ratings "based upon actual first-hand experiences other users have had[,]"; and

b.  Angie's List "does not endorse" any Service Providers. However, contrary to Angie's List reports, this is not how Angie's List operates;

c.  Angie's List expressly disclaims any manipulation or control of consumer generated reviews by stating that it does not guarantee the accuracy, integrity, quality or appropriateness of any Content transmitted to or through the Service. You acknowledge that Angie's List simply acts as a passive conduit and an interactive computer Service Provider for the publication and distribution of Content;

d.  Angie's List does not endorse and is not responsible or liable for any Content, Service Provider Content, data, advertising, products, goods or services available or unavailable from, or through, any Service Providers.

**B.    How the Consumers' Reviews, Ratings and Ensuing Searches of Those Ratings Are Purported by Angie's List to Work**

19.    A review posted by a consumer to Angie's List is supposed to be a narrative description and endorsement, whether positive or negative, of goods or services actually provided to the consumer. Accompanying the cumulative reviews of a Service Provider is a letter-grade rating from "A" to "F", which ratings are alleged to be based upon the Service Provider's price, quality, responsiveness, punctuality and professionalism as recorded in the consumer reviews of its service as well as consumers' "overall experience" with the Service Provider.

20.    Members are told, repeatedly, by Angie's List that they can search for the "best service provider". Based upon these assurances, Angie's List members, consumers and the public reasonably and justifiably expect that their search results will identify the provider best suited to satisfy the consumer's stated needs. According to the FAQ that Angie's List publishes

on the Angie's website, providers can, at the consumer's option, be sorted and shown based on reviews and ratings or based upon other criteria such as geographical location.

21.    Angie's List tells consumers in its FAQ that:

A provider's position in your search results is determined by their recent grades and number of reviews. Companies with the best ratings from members will appear first. To help prevent the same providers from always showing up first, companies who have earned similar grades are rotated within your results.[7]

22.    As the FAQ section then reiterates: "Companies with a poor rating from our members will appear lower down on the List after businesses who have earned good ratings for superior work."[8]

## C.    How Angie's List's Scheme of Consumer Reviews, Endorsements, Ratings and Searches Actually Functions

23.    In truth and in fact, Angie's List does not list, rank and depict the Service Providers identified in response to searches of its Angie's website according to actual consumer reviews and ratings by actual users of such providers' goods/services.  Instead, Angie's List ranks Service Providers higher in these lists based on whether and how much the provider pays to Angie's List to do so.

24.    According to the marketing materials which Angie's List has directed to Service Providers, as opposed to consumers:

a.    Advertising on Angie's List "exponentially increases [their] exposure to searching members …";

b.    The materials further state that "Businesses that purchase a display advertisement receive about 12 times more profile views from members" on average.  Once a Service Provider starts to get reviews, certain

---

[7] *See* Angie's List FAQ, "Understanding and Sorting Search Results" at https://www.angieslist.com/faq/understanding-and-sorting-search-results/ (updated February 8, 2017) (last accessed September 17, 2017).

[8] *See* Angie's List FAQ, "Negative Reviews on the List" at https://www.angieslist.com/faq/negative-reviews-list/ (updated November 17, 2016) (last accessed September 12, 2017).

advertising and promotion options are then unlocked "that give [the Service Provider] an advantage of increased exposure";

c.      In addition, Angie's List markets "Premium options" to advertisers that allow Service Providers to feature their business more prominently that they would be based upon consumer reviews alone through Web Placement or Keyword Advertising ("Appear on the first page of search results so members can easily find and access your review.") and Call Center Advertising ("Be one of only four companies provided when a member calls looking for a highly-rated provider.").

25.     Angie's List misleads and deceives consumers, advertisers, other Service Providers and the public by concealing the fact and/or failing to reasonably disclose to consumers that Service Providers can and do pay to improve their company's placement in search results regardless of their actual consumer reviews and ratings:

a.      Consumers reasonably assume that providers appearing at the "top" of the list are the most highly recommended by other consumers;

b.      Consumers, therefore, rarely search past the first one or two pages of the List;

c.      In practical effect, consumers are deceived into choosing service providers ranked highly in Angie's List search results, even if those providers do not actually have superior consumer ratings or reviews;

d.      The consumer also reasonably believes that the lower the Service Provider appears in the results, the less reviews and/or ratings that the Service Provider has or the less favorable its reviews and, as a consequence, the less desirable the provider's service and the less likely that the consumer will receive complete satisfaction/value for money;

e.      Angie's List falsely, fraudulently and deceptively represents to consumers that it will "accept both good and bad reviews and … never remove reviews unless the member who posted the feedback contacts us to delete it"[9] when in truth and in fact, Angie's List employs a so-called dispute resolution process by which reviews can be and are expunged or rendered inaccessible to other consumers searching the List;

f.      In addition, Angie's List will engage in other deceptive tactics such as customizing Service Providers' profiles and "fishing" for favorable consumer ratings of paying Service Providers, all to ensure that Service

---

[9] See Angie's List FAQ, "Negative Reviews on the List" at https://www.angieslist.com/faq/negative-reviews-list/ (updated November 17, 2016) (last accessed September 12, 2017).

Providers who pay money to Angie's List receive more reviews than their competitors, and more favorable reviews, which ultimately affects search result rankings.

**D.     Actual Consumers Have Been Deceived Into Believing That Angie's Website Contains Only Objective and Unfiltered Consumer Reviews of Service Providers When in Truth and in Fact, it Does Not**

26.     On July 11, 2016, plaintiffs Janelle Moore ("Moore"), Michelle Zygelman ("Zygelman") and Gary Glick ("Glick") on behalf of themselves and all others similarly situated, filed their Conditional Amended Class Action Complaint in the class action entitled <u>Moore, et al. v. Angie's List, Inc.</u>, Case No. 2:15-CV-01243, then pending before the United States District Court for the Eastern District of Pennsylvania ("Consumer Class Action").

27.     In the context of their Complaint, the claims asserted of which have now been settled, resolved and satisfied by Angie's List, Moore, Zygelman and Glick each alleged and represented in the context of such Consumer Class Action that they each were or had been fee-paying members of Angie's List as further alleged in the Consumer Class Action.

28.     As alleged in the Consumer Class Action Complaint, plaintiff/consumer Moore first paid to become a member of Angie's List in or about December 2012 and, thereafter, she paid to renew or re-join in each year thereafter, until approximately June 2015:

a.     At the time consumer Moore became a member and renewed her membership (or re-joined), Moore was exposed to Angie's List's marketing statements of a consumer-oriented ethos as described above, including but not limited to the representation, that "businesses don't pay." For example, she has seen multiple television, internet or print advertisements for Angie's List. Moore took note that Angie's List provided member-generated content, including member-generated reviews and rankings.     She understood from Angie's List's marketing and advertising that these rankings, reviews and related content could not be affected or manipulated by the Service Providers appearing on the List or by Angie's List. She believed that Angie's List was a forum for unaffiliated people to share their views of various local Service Providers in an open, candid and objective way and that Angie's List presented itself as a unique alternative to other on-line offerings where the listed Service Providers paid to play;

    b.    At the time, consumer Moore signed up to become a member and to renew (or to re-join), she had not seen any written content on the Angie's website or otherwise that contradicted or challenged her understanding of how Angie's List worked;

    c.    Consumer Moore recalls paying for her membership and using the List at various times to identify or evaluate Service Providers;

    d.    Both before and after she became a member, Moore, as a reasonable consumer in her position, believed that Service Providers did not pay Angie's List to advertise in the manner identified herein, such as advertising to secure better placement in search results;

    e.    Consumer Moore learned recently that Angie's List manipulates the List's search results and rankings to prop-up certain Service Providers over others, a form of paid advertisement, and active involvement in favoring and promoting the success of certain Service Providers over others. Had she not been misled as described herein, and had she been truthfully and fairly informed of how the List really works, Plaintiff Moore would not have paid money, or would have paid substantially less money, to join, renew, and/or continue his membership in Angie's List.

29.    As alleged in the Consumer Class Action Complaint, plaintiff/consumer Zygelman first paid to become a member of Angie's List in or about June 2012 and, thereafter, she paid to renew during each membership cycle since she joined:

    a.    At the time consumer Zygelman became a member and renewed her membership, Zygelman was exposed to Angie's List's marketing statements of a consumer-oriented ethos as described above, including but not limited to the representation that "businesses don't pay." For example, she has seen multiple television, internet or print advertisements for Angie's List. Zygelman took note that Angie's List provided member-generated content, including member-generated reviews and rankings. She understood from Angie's List's marketing and advertising that these rankings, reviews and related content could not be affected or manipulated by the Service Providers appearing on the List, or by Angie's List. She believed that Angie's List was a forum for unaffiliated people to share their views of various local Service Providers in an open, candid and objective way and that Angie's List presented itself as a unique alternative to other on-line offerings where the listed Service Providers paid to play;

    b.    At the time consumer Zygelman signed up to become a member and to renew, she had not seen any written content on the Angie's website or otherwise that contradicted or challenged her understanding of how Angie's List worked;

     c.      Consumer Zygelman recalls paying for her membership and using the List at various times to identify or evaluate Service Providers;

     d.      Both before and after she became a member, Zygelman, as a reasonable consumer in her position, believed that service providers did not pay Angie's List to advertise in the manner identified herein, such as advertising to secure better placement in search results;

     e.      Zygelman recently learned that Angie's List manipulates the List's search results and rankings to prop-up certain Service Providers over others, a form of paid advertisement and active involvement in favoring and promoting the success of certain Service Providers over others. Had she not been misled as described herein and had she been truthfully and fairly informed of how the List really works, Zygelman would not have paid money, or would have paid substantially less money, to join, renew and/or continue her membership in Angie's List.

30.     As alleged in the Consumer Class Action, plaintiff/consumer Glick first paid to become a member of Angie's List in or about 2012 or 2013. He paid to renew each membership cycle since he joined:

     a.      At the time consumer Glick became a member and renewed his membership, Glick was exposed to Angie's List's marketing statements of a consumer-oriented ethos as described above, including but not limited to the representation that "businesses don't pay". For example, he has seen multiple television, internet or print advertisements for Angie's List. Glick took note that Angie's List provided member-generated content, including member-generated reviews and rankings. He understood from Angie's List's marketing and advertising that these rankings, reviews and related content could not be affected or manipulated by the Service Providers appearing on the List or by Angie's List. He believed that Angie's List was a forum for unaffiliated people to share their views of various local Service Providers in an open, candid and objective way and that Angie's List presented itself as a unique alternative to other on-line offerings where the listed Service Providers paid to play;

     b.      At the time Glick signed up to become a member and to renew, he had not seen any written content on the Angie's website or otherwise that contradicted or challenged his understanding of how Angie's List worked;

     c.      Consumer Glick recalls paying for his membership and using the List at various times to identify or evaluate Service Providers;

     d.      Both before and after he became a member, Glick, as a reasonable consumer in his position, believed that Service Providers did not pay

Angie's List to advertise in the manner identified herein, such as advertising to secure better placement in search results;

e.    Glick learned that Angie's List manipulates the List's search results and rankings to prop-up certain Service Providers over others, a form of paid advertisement and active involvement in favoring and promoting the success of certain Service Providers over others. Had he not been misled as described herein and had he been truthfully and fairly informed of how the List really works, Glick would not have paid money, or would have paid substantially less money, to join, renew and/or continue his membership in Angie's List.

**E.    The Actual Experience of Service Providers, Including Strauss, With Angie's List and the Actual Injury Which They Have Suffered as a Result of Angie's List's Unlawful, Unfair and Deceptive Advertising, Acts or Practices**

31.    Doing business as Classic Tree, Strauss specializes in tree removal, tree trimming, tree pruning and stump grinding. Classic Tree also provides emergency assistance to residential customers in the event a tree falls onto a car or home. Classic Tree was founded by Strauss in 2003 and he remains its sole proprietor.

32.    Classic Tree provides these services to residential and commercial consumers located in and around the Kansas City Metropolitan area, which includes counties in both Missouri and Kansas.

33.    Since 2005, Classic Tree has paid Angie's List more than $200,000.00 in advertising services fees and coupon retention percentages, in an effort to appear higher on the "List" displayed on Angie's website, upon consumers' search for arborists, tree removal or tree care.:

a.    The higher a Service Provider appears on the "List", the more likely consumers are to contact the Service Provider, especially if the Service Provider has many positive reviews;

b.    To facilitate placement on the List, advertising services are sold to the Service Provider by Angie's List.

34. Classic Tree and Angie's List have entered into advertising agreements each year from 2005 through 2016:

      a.    For example, on September 3, 2015, Strauss on behalf of Classic Tree executed an agreement to receive advertising services from Angie's List ("Agreement"). The term of the Agreement was twelve (12) months, beginning on October 6, 2015. The advertising services provided by Angie's List were "Call Center" and "Web Ad" for $500.00 a month;

      b.    On or about September 3, 2015, Classic Tree paid Angie's List $6,000.00 for twelve (12) months of advertising service. Because Classic Tree prepaid for the entire year, Classic Tree received two (2) additional months of advertising services, extending the Agreement to December 5, 2016.

35. In addition to requiring that a Service Provider pay to advertise in order to keep or retain its position on the List, Service Providers are also required by Angie's List to advertise "coupons" for "discounts" or other benefits. When a customer redeems a coupon by purchasing services from the Service Provider, Angie's List is entitled to a material portion of the "gross revenue" collected by the Service Provider:

      a.    The coupon appears highly desirable to the consumers using the coupon who can receive up to fifty (50%)[10] percent off of tree care services, which at times may be a necessary expense, particularly after a storm or a natural disaster;

      b.    A Service Provider who enrolls in Angie's coupon program will receive benefits from Angie's List, such as email blasts to potential customers which may increase amount of business.

36. For each coupon used by a consumer, the Service Provider is responsible for paying to Angie's List a "share" of its "gross revenue" received from the consumer. For example, under the terms and conditions associated with Angie's "Big Deal Promotion" scheme:

> "Angie's List and Service Provider" are required to "share the gross revenue collected from Consumers who purchase the Deal..."

---

[10] Angie's List requires its Service Providers to advertise at least one of the following coupons: (1) The Big Deal Coupon; (2) The Store Front Coupon; and (3) a standard percentage discount for members.

  a.  Angie's List collects 25% of the gross revenue from its Services Providers, including Classic Tree, for each "Big Deal Coupon" redeemed by a consumer[11];

  b.  This sharing of revenues gives Angie's List a direct financial interest in the business of each coupon offeror.

37.  At the same time, this coupon scheme allows Angie's List and the participating providers to practice a game of bait-and-switch on the consumer:

  a.  The issuing provider may not honor the coupon and Angie's List will do nothing to make it do so;

  b.  Since, as indicated, Angie's List itself "makes money off of" the coupon, it has every incentive to "bury" and will, in fact, "bury" other competing providers on the List thus misleading consumers into believing that coupon offeror is in fact the most sought after Service Provider.

38.  Classic Tree advertised under Angie's List the Big Deal Coupon program/scheme during the Fall and Winter seasons in 2011:

  a.  From October 3, through January 10, Classic Tree shared with Angie's List 25% of its gross revenues received for each coupon redeemed by a consumer;

  b.  Unlike other offerors, Classic Tree honored each and every coupon presented by a consumer and shared with Angie's List the appropriate amount of revenue pursuant to the Agreement.

39.  However, Classic Tree refused to continue advertising the Big Deal Coupon and decided to advertise only Angie's "Store Front Coupon", a coupon which entitled Angie's List to a lesser portion of any gross revenues:

  a.  Angie's List tried numerous times to persuade Classic Tree to utilize its Big Deal Coupon scheme again but Classic Tree refused, choosing to advertise only the Store Front Coupon;

  b.  In 2012, Angie's List instructed Ms. Carly Dembeck, who was its Sales Representative for the Kansas City Metropolitan Area, to stop allowing

---

[11]  This percentage is derived from a Big Deal Coupon advertised in 2011; the revenue share by Angie's List has and continues to increase.

Classic Tree to promote its services on Angie's List using advertising coupons;

c.  On information and belief, Ms. Dembeck objected to those instructions because Classic Tree's use of coupons had been mutually rewarding;

d.  Despite Ms. Dembeck's objection, Angie's List insisted that she work with other Service Providers to advertise coupons for tree care services in the Kansas City Metropolitan area.

40.  As a result, Angie's List asked Hoffmann Tree Services ("Hoffmann"), a Classic Tree competitor, to advertise the Big Deal Coupon:

a.  Hoffmann agreed to advertise the Big Deal Coupon, but refused to honor the coupons or give the discounts when the consumers attempted to redeem them;

b.  In light of Hoffmann's refusal to honor the coupons, Angie's List asked Classic Tree itself to honor them, which it agreed to do;

c.  Although Classic Tree did not intend to advertise the Big Deal Coupon ever again, it nevertheless honored the Hoffmann coupons in the spirit of competition and good customer service;

d.  In total, Classic Tree honored approximately 23 of Hoffmann's Big Deal Coupons at the behest of Angie's List.

41.  In or around 2013, Classic Tree's representative, Robbie Melton, ended his business relationship with Classic Tree and began working for a Strauss competitor named Eden Tree:

a.  On information and belief, Mr. Melton convinced Angie's List that Eden Tree itself could begin offering the Big Deal Coupon profitably and successfully notwithstanding that Classic Tree was the only Service Provider for tree care services in the Kansas City Metropolitan area that had been successful, ever, in using the Big Deal Coupon;

b.  Angie's List then excluded Classic Tree from its published list, which disrupted Classic Tree's normal business operations;

c.  Since it was excluded from the List, Classic Tree was unable to adequately compete for online consumers of tree care services in the Kansas City metropolitan area.

18

42. Angie's List's purported justification for removing and, in effect, "blacklisting" Classic Tree was an alleged "criminal background" check which revealed that a misdemeanor involving Strauss had occurred in 2013. Such removal (which was subsequently deemed in error, and an apology issued to Strauss *See* ¶ 46) was conveyed to consumers through a message on Angie's website stating that Classic Tree had either not met the requisite qualifications to be on List, or that it had "no ratings or reviews.".

43. The true reason for Angie's List and Eden Tree's agreement to blacklist Classic Tree, however, was to limit consumer choices by directing them to a competing tree care provider who was then offering the "Big Deal Coupon" and with whom Angie's List would share any revenues.

44. Excluded from the List, Classic Tree suffered a substantial loss in gross revenue, goodwill and market share.

45. Classic Tree remained excluded from the List appearing on Angie's website for approximately three months in late 2013.

46. After the significant and extensive disruption to Classic Tree's normal business operations and after Classic Tree engaged counsel, Angie's List offered an apology, and put Classic Tree back on the List as a Service Provider.

47. Angie's List, however, began to manipulate Classic Tree's placement on the List, especially when Eden Tree advertised the Big Deal Coupon.

48. From 2013 through 2016, Angie's List repeatedly buried Classic Tree on the List, making it virtually impossible for interested consumers to view its services, while Eden Tree itself advertised using the Big Deal Coupon scheme.

49.     Based on its many positive consumer reviews and endorsements as received over the years, Classic Tree was unjustifiably placed low on the List of providers in an effort to suppress price competition and otherwise to "punish" Classic Tree.

50.     In or around the fall of 2016, Angie's List failed to honor its obligations owed to Classic Tree under the existing, valid and still enforceable advertising agreement identified in ¶ 34 above.

51.     Since the fall of 2016, Classic Tree has been excluded from the List and unable to adequately compete for online consumers of tree care services in and around the Kansas City metropolitan area.

52.     Moreover, Angie's List has falsely and fraudulently disparaged, mis-described and defamed Classic Tree, its business and services by declaring to consumers who performed searches of the Angie's website that:

    a.    Classic Tree had been the subject of "no ratings or [consumer] reviews" when in truth and in fact, it had many, manifestly favorable ratings and reviews;

    b.    Classic Tree had not met certain "criteria" to be listed on the Angie's website when in truth and in fact, it more than satisfied any published criteria;

    c.    Classic Tree had no "local offers" to extend to consumers when in truth and in fact, it had several.

53.     In sum, Classic Tree, Strauss' business, was not merely disparaged through its omission from the "List" appearing on Angie's website but was the victim of false advertising published by Angie's List for other providers of the same or similar services whose position, ranking and purported customer approbation was not, in fact, the product exclusively of customer reviews, endorsements and/or satisfaction but rather was bought and paid for through advertising fees paid to Angie's List by his competitors.  As a result, Strauss has suffered loss of

business, trade, and income and diminution in value of his name, trade name, brand and reputation in an amount exceeding $100,000.

54.      According to published reports, Stanley Grenadeck ("Grenadeck"), the owner of a landscape and construction business in Minneapolis, Minnesota says that after a few positive reviews by Angie's List members at a time when he was not an Angie's List advertiser, he was contacted by an Angie's List sales representative asking whether he would be "willing to pay $33,000 to stay at the top of the page":

   a.      Grenadeck says that he "talked" Angie's List "down to $3,000" and then "created a YouTube video to help protect other business owners from spending too much" with Angie's List;

   b.      Grenadeck says that he pays $581.51 per month for an "Al.COM web ad";

   c.      Grenadeck says that paying Angie's List is the key to getting "optimized" which he described as "positioned higher on the site so that you're one of the first to show up when "consumers search" for a Service Provider;

   d.      Grenadeck says that "when you pay" Angie's List, "they take the key words that make you sound like a super hero and put them in big, bold letters";

   e.      Grenadeck thinks that this "advertising scheme" by Angie's List "is shady".

55.      Tony of Brighton, Michigan posted a comment to Angie's List's own Angie's website on July 8, 2017 wherein he said all of the following:

   a.      He is a "contractor in Michigan and contacted Angie's List to try to get more leads", but ultimately determined not to "sign up" with Angie's List because "they wanted" him "to sign" a one year "contract with them";

   b.      Two weeks later, he was contacted by an Angie's List sales representative and, it appears, was ultimately allowed to sign a six-month contract, the cost for which "went up almost 50%";

   c.      Tony did not get "a single lead from" Angie's List after three weeks of paying for Angie's List advertising and when he spoke with one of Angie's List's "customer success team", their advice to him was to "get a bigger advertising area" and pay them more money.

56.    "T. of Albuquerque", New Mexico posted a comment on Angie's website on July 1, 2017 wherein "T." noted that:

    a.    When he "initially signed up to pay Angie's List their high monthly fee", they told him clearly "that with this monthly fee … they would list" his "company at the top of their list as well as let me offer coupons that were completely in" his control;

    b.    "T." could see that Angie's List has "the potential to throw a few good companies under the bus";

    c.    T's company "is a highly rated company across the board even on Angie's List; however, recently their review practice … changed";

    d.    Angie's List now lets "any biased individual who has never done business with a business listed on Angie's List" to "make[ ] a complaint or merely state their opinion.  It could be your rival, it could be a disgruntled employee, it could be an honest person";

    e.    "When you go to Angie's List, you are sometimes getting uneducated, opinionated comments (not actual reviews) and … those who are simply having a bad day could easily put someone out of business";

    f.    "I highly recommend that if you own a business, NEVER pay Angie's List for a listing".

57.    "Robert of Katy", Texas posted a comment to Angie's website on May 29, 2017 wherein he stated that:

    a.    Robert was "blown away" by Angie's List's "flat out lies and business practice" observing that if "a referral company as large as Angie's List cannot be honest with the business they do with, then what can anyone do to show [the] consumer they are a good company[?]";

    b.    Robert "bought into an ad they ran for [$268.00 a month] for a spot in the top 25 contractor[s] for [an] area and for a month … got not one call";

    c.    Robert tried to cancel but was told he had a contract with Angie's List "for a year" when "what the lady told me [he] was signing" when he began running the ads was merely a "background check";

    d.    Robert stopped paying "and now" Angie's List has taken his "company info down", entirely from the Angie's website.

58.    "Neno of Virginia Beach", Virginia posted the following comments to Angie's website on May 8, 2017:

      a.    Neno is a "contractor on Angie's List and … [has] an account with them";

      b.    Neno has "six reviews but when" he logs in "on Angie's List and search[es] for [his] business", he does not see any results;

      c.    Instead, he sees "all kind[s] of other businesses including (after search result 5 or 6) businesses that are not even in the same industry" as Neno is;

      d.    Neno "called Angie's List and asked them: why when I type the name of my business, I do not see our business in the search results, we have six reviews, all of them A's, 100% customer satisfaction and would recommend and/or rehire me?";

      e.    The "customer rep responded that if we do not pay, we do not appear in the search results" which means that "when YOU want to hire a contractor and search on Angie's List, you will not necessarily find the contractors with the best rating, but the ones that paid to be on the search results";

      f.    Neno says not to "trust Angie's Reviews" since they "clean up the names of companies that pay well and disregard those that do not pay them".

59.    "Kelly of Getzville", New York, a consumer, posted his comment on Angie's website on April 12, 2017 stating that:

      a.    He had "been an Angie's List member for years";

      b.    A couple of years ago, he "hired a contractor who did a great job";

      c.    He "review[ed] that company on Angie's List and hired him for several more jobs" since he was a contractor who paid "attention to detail" and "provide[d] high quality work and at a reasonable price";

      d.    The contractor told Kelly "recently about a problem he was having with Angie's List charging him for advertising without his consent and giving him the run around when he tried to call about it";

      e.    Kelly is "an attorney" and "decided to help" the contractor and "[w]ithin a couple days, Angie's List removed my positive reviews of [the] company and claimed that there is a conflict of interest";

      f.    "Seems to me that they are out to punish" the contractor "any way they can for complaining".

23

60.    "Lindsay of Pompano Beach", Florida posted his comment to Angie's website on March 1, 2017 noting the following:

a.    Lindsay's air conditioning company "had been advertising with Angie's List since 2009 to about October, 2016;

b.    Lindsay "was struggling with" Angie's List to fix an "incorrect grade of a B when it was supposed to be an A" since "if you are a B rated anything on any online platform, you might as well not be there at all";

c.    Angie's List "admitted to the grade being incorrect in multiple areas of their website for many months due to a website platform change";

d.    Lindsay complained that portraying his "company as a B rated company when it is an A" caused him to lose "a lot of money" and Lindsay then "refused to pay" his "advertising money to" Angie's List until they fixed the issue;

e.    Not only did Angie's List fail to fix the issue, "they have put a disclaimer on" Lindsay's listing "saying that" his company "does not" embody what a "company" needs to be in order to be on Angie's List".

**F.    Angie's List's Actual Receipt of Benefits From Its Wrongful Conduct**

61.    Angie's List generates the majority of its revenue from the Service Providers who pay to have their companies shown first, and most prominently on the Angie's website.  In 2011, 2012, 2013, and 2014, Angie's List derived 62%, 69%, 73%, and 76.8% of its total revenue, respectively, not from its consumers/members but from Service Providers.  Stated otherwise, in 2014, Angie's List made approximately $241.9 million from Service Providers, or more than three times its revenues in consumers' membership fees.  Recognizing this, in June of 2016, Angie's List instituted a "freemium" model, offering a bare-bones free membership, as well as "Silver" and "Gold" plans (at a cost of $24.99 and $99.99 per year, respectively). This new course of business provided even further incentive to extract more advertising revenue from service providers to compensate for the loss of paying memberships.[12]  Therefore, despite its oft-

---

[12] https://www.angieslist.com/faq/what-are-my-membership-options/

published ethos of "consumers first", Angie's List's economic fortunes are aligned far more with Service Providers than consumers.

62.    Despite what Angie's List's claims in its Membership Agreement, it is not acting or no longer acts as a passive conduit for consumers. Instead, Angie's List actively pursues "advertising" and revenue sharing/referral commissions from Service Providers. In return, Angie's List inflates the search result rankings of those Service Providers who pay "advertising" fees. Angie's List tells Service Providers that the fees will give then an advantage of "increased exposure" that "propel[s] you ahead of your competition"[13], none of which was disclosed to Angie's List consumers, other providers or the public who reasonably believe the List is organized by other consumers' experiences.

63.    Angie's List tells consumers and the public about Service Providers' opportunities to offer discounts and coupons to members, but does not disclose the fact either that by paying Angie's List to "run"/publish advertisements, a Service Provider may control its rankings as depicted to consumers and the public and that Angie's List shares in revenues generated by that enhanced ranking.

64.    Angie's List has failed to disclose to its members, advertisers, Service Providers and the public that it has effectively transformed itself from a passive, consumer-driven, web-based reporter of consumers' ratings, endorsements and experiences into an electronic publisher of commercial advertising and a percentage-compensated broker of consumer/customer referrals.

## CLASS ALLEGATIONS

65.    Plaintiff brings this action on behalf of himself and all others similarly situated as provided under Fed. R. Civ. P. 23(a), 23(b)(1), (b)(2), (b)(3) and (c)(4).  On his own behalf and

---

[13]  Angie's List Marketing Guide, p. 8, available at http://content.angiesllist.com/company/images/sp/almarketingguide.pdf.

on behalf of such other persons, plaintiff asserts claims against Angie's List for false advertising in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) for the reason that in the context of commercial advertising or promotion, Angie's List has represented the nature, characteristics, qualities or geographic origin of its or another person's services or commercial activities and for unfair, deceptive and/or unconscionable acts or practices in violation of the Kansas Consumer Protection Act, K.S.A. §§ 50-626 and 50-627.

### A.   Proposed Classes

66.   The proposed classes are defined as follows:

a.   All persons in the United States who, within the applicable statute of limitations, paid any sums or gave anything of value to Angie's List in exchange for the promotion, advertisement or marketing of such person's goods or services;

b.   All persons in the United States who, within the applicable statute of limitations, did not pay Angie's List to promote, market or advertise their goods or services, but whose goods or services were of a kind and character reasonably fungible with goods or services sold or provided directly to consumers by Service Providers who did pay Angie's List to market, advertise and/or promote their goods and services and with whom such persons were in competition;

c.   All persons in the state of Kansas who, within the applicable statute of limitations, paid any sums or gave anything of value to Angie's List in exchange for the promotion, advertisement or marketing of such person's goods or services;

d.   All persons in the state of Kansas who, within the applicable statute of limitations, did not pay Angie's List to promote, market or advertise their goods or services, but whose goods or services were of a kind and character reasonably fungible with goods or services sold or provided directly to consumers by Service Providers who did pay Angie's List to market, advertise and/or promote their goods and services and with whom such persons were in competition.

67.   Excluded from each and all of these classes is Angie's List, any entity in which Angie's List has a controlling interest; Angie's List's officers, directors, legal representatives, successors, subsidiaries, affiliates and assigns; and any judge, justice or judicial officer presiding

in or over this matter, together with all members of such judge, justice or judicial officers'
immediate families and/or judicial staff.

### B.    Certification of the Proposed Classes is Appropriate

68.    Each of the proposed classes meets the requirements of Fed. R. Civ. P. 23(a),
(b)(1), (b)(2), (b)(3) and (c)(4).

69.    <u>Numerosity and Ascertainability</u>: Although the actual and precise numbers of
members of the classes is unknown to plaintiff at this time:

a.    Angie's List 10Q and 10K reports for the fourth quarter of 2016 and for the
fiscal year 2016 indicate that as of 12/31/16. Service Provider revenue
which, according to Angie's List, includes "advertising and ecommerce"
totaled $64.4 million for the last quarter of 2016 versus only $12.5 million
in membership revenue;

b.    Angie's List had 55,644 "participating Service Providers", meaning those
sellers of goods and services to consumers who paid Angie's List to
market, advertise and/or promote their goods and services or shared
revenues with Angie's List;

c.    Those Service Providers both in the United States, generally, and in the
state of Kansas who were induced to advertise on Angie's List will be
easily identifiable from Angie's List's own books and records;

d.    Those sellers of goods and services to consumers both in the United States,
generally, and the state of Kansas who were listed on Angie's List but did
not pay Angie's List to market, advertise and/or promote their goods and
services will be easily identifiable through Angie's List's records.

70.    <u>Commonality and Predominance</u>:  There are many questions of law and fact
common to the claims of plaintiff and the other members of the classes and those questions
predominate over any questions that may affect individual members of the classes.  Common
questions for the classes include, *inter alia*:

a.    Whether Angie's List misrepresented, failed to disclose or affirmatively
concealed the fact that it manipulates the results of searches of its Angie's
website for qualified Service Providers;

b.   Whether Angie's List falsely, fraudulently, deceptively or misleadingly represented that it does not accept money from Service Providers, the receipt of which has impact upon the results provided to consumers who choose to search Angie's website and the rankings of Service Providers depicted in those searches;

c.   Whether the rankings ascribed to Service Providers on the Angie's website or in the electronic results of consumer searches of such website were false, misleading and/or deceptive for the reason that such rankings were based not upon consumer reports, commentaries and endorsements, but the payment to Angie's List by such Service Providers of fees in exchange for prominent/ preferment;

d.   Whether Angie's List has, on its Angie's website, made and published commercial statements respecting fee-paying Service Providers and persons in commercial competition with them, the objective of which was to induce or influence consumers to purchase services from such fee-paying Service Providers, exclusively;

e.   Whether in the context of commercial advertisements or promotions, Angie's List has made and published on it Angie's website false and misleading statements of fact respecting Service Providers, their goods, products, services and business;

f.   Whether the false and misleading statements of facts made and published by Angie's List on the Angie's website both deceived or were likely to deceive consumers and the public as to the kind and character of services sold and provided by Service Providers; and/or consumer acceptance and satisfaction with and concerning those services, all to the injury of such Service Providers' business, reputation and standing as suppliers of such services to consumers and the public;

g.   Whether such false and/or misleading statements of fact respecting the nature, characteristics and/or qualities of the services and/or commercial activities of class members have caused actual and continuing injury to such class members' commercial interest in the name and reputation of their businesses and in the sale and/or their reasonable expectations of/for the continuing sale of their services to consumers and the public;

h.   Whether class members have suffered substantial economic harm and/or reputational injury as a direct and proximate result of the false and/or deceptive or misleading statements of fact made and published by Angie's List for the reason that such deception of consumers has caused them to withhold trade from them;

i.   Whether Angie's List has engaged in deceptive acts or practices in connection with consumer transactions with its advertisers within the

meaning of K.S.A. § 50-626 for the reasons that it has, among other things:

i.   Sold advertising, marketing and/or promotional services when it knew or had reason to know that such services would not have the characteristics, uses and/or benefits which it represented them to have;

ii.  Represented that such advertising, marketing and/or promotions would conform to standards of quality/usefulness in respect of which such services, as provided, were in truth materially deficient;

iii. Represented that such advertising, marketing and/or promotions would have uses, benefits and/or characteristics of a kind and character represented by Angie's List when in truth and in fact, Angie's List possessed no reasonable basis for making any such representations;

iv.  Sold such advertising, marketing and/or promotional services through the willful use of exaggeration, falsehood, innuendo or ambiguity as to material facts;

v.   In selling such advertising, failed, willfully, to state material facts or willfully concealed, suppressed or omitted material facts in the context of advertising, marketing and promotions made and published by Angie's List.

j.  Whether in publishing advertising, marketing and/or promotional material directed to consumers regarding the goods or services offered by its advertisers, Angie's List has engaged in deceptive acts or practices for the reasons that, it has:

i.   Made representations to consumers in the state of Kansas, knowingly or with reason to know that the services which it advertised would not have the characteristics, uses and/or benefits which it was alleged to have;

ii.  Advertised, marketed and promoted services alleged to have a consumer-accepted standard of quality when such services, as provided, were materially deficient in that respect;

iii. Published advertising, marketing and/or promotions declaring that the services so advertised would have consumer-accepted benefits and/or characteristics of a kind and character represented by Angie's List when in truth and in fact, Angie's List possessed no reasonable basis for making any such representations;

iv.     Published advertising, marketing and/or promotion through the willful use of exaggeration, falsehood, innuendo or ambiguity as to material facts;

v.      Failed, willfully, to state material facts or willfully concealed, suppressed or omitted material facts in the context of advertising, marketing and promotion which it made and published;

vi.     Falsely and fraudulently disparaged the goods and services or business of Service Providers who had failed or refused to pay anything to Angie's List to advertise their services by claiming, to consumers and the public, that those Service Providers who had elected to become advertisers and had paid Angie's List for such advertising had received and were the subject of consumer approval, acceptance, endorsement and/or satisfaction and were to be preferred over all such persons.

k.      Whether through its solicitations and/or inducements to Service Providers to become advertisers on the Angie's website or otherwise, and through its electronic publication of advertisements or promotions for those Service Providers who have become its advertisers, Angie's List has engaged in unconscionable acts or practices:

i.      For all the reasons identified in ¶¶ 70(l) and 70(j) hereinabove;

ii.     For the reason that it has made misleading statements of opinion regarding the kind and character of the goods or services offered by its advertisers and, in particular, that its advertisers had earned the rankings ascribed to them as a result of their history of consumer satisfaction, acceptance, approbation and endorsement when in truth and in fact, such advertisers had paid for whatever position of prominence they occupied.

71.     <u>Adequacy</u>:  Plaintiff will fairly and adequately represent and protect the interest of each and all of the classes and has retained counsel competent and experienced in complex litigation and class actions.  Plaintiff has no interests antagonistic to those of the classes and there are no defenses unique to plaintiff.  Plaintiff and his counsel are committed to prosecuting this action vigorously and with effect on behalf of the members of the proposed classes and have the financial resources to do so.  Neither plaintiff nor his counsel have any interest adverse to those of other members of the classes.

72.   <u>Risks of Prosecuting Separate Actions</u>:  This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the defendant or would be dispositive of the interests of members of the proposed classes.  Furthermore, since Angie's List continues to conduct business, continues to provide consumers with the product of searches of its website for qualified Service Providers and continues to receive payment from Service Providers in exchange for higher rankings, prominence and/or preferment to which they would not be entitled based strictly upon customer reviews, commentaries and/or endorsements, one standard of conduct is needed to ensure the future fairness, truthfulness and/or non-deceptiveness of Angie's List's marketing, advertisement and/or promotions on behalf of Service Providers.

73.   <u>Angie's List's Policies and Practices Applied Without Differentiation to Each Member of Each of the Classes</u>:  This case is appropriate for certification because Angie's List has acted or refused to act on grounds generally applicable to plaintiff and the proposed classes as a whole thereby requiring the Court's imposition of uniform relief to ensure capable standards of conduct towards members of the classes and making final injunctive relief appropriate with respect to the proposed classes as a whole.  Angie's List's practices challenged herein apply to and affect the members of the classes uniformly and without differentiation and plaintiff's challenge to those practices hinges on Angie's List's conduct with respect to the proposed classes as a whole, not on individual facts or law applicable only to plaintiff, or to any single plaintiff or to any single class member.

74.   <u>Superiority</u>: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of plaintiff and the members of the classes.  The injuries suffered by each individual

member of the classes are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Angie's List's conduct.  Absent a class action, it would be virtually impossible and thus substantially unlikely for individual members of the classes to obtain effective relief from Angie's List.  Even if members of the classes could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties including the Court and Angie's List and would require duplicative consideration of the common legal and factual issues presented here. By contrast, the class action presents far fewer management and/or jurisprudential difficulties and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single court in the context of a single proceeding.

## COUNT I
### (False Advertising in Violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125)

75.     Strauss restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-74 hereinabove.

76.     Angie's List has, on its Angie's website, made and published commercial statements respecting Strauss and persons in commercial competition with Strauss, the objective of which was to induce or influence consumers to purchase services from persons other than Strauss, all of which were disseminated electronically using instrumentalities of commerce and otherwise sufficiently to the relevant purchasing public to constitute "advertising" or "promotion".

77.     In the context of commercial advertisements or promotions, Angie's List has made and published on the Angie's website false and misleading statements of fact respecting Strauss, his goods, products, services and business and those of all persons situated similarly to Strauss.

78.   The false and misleading statements of facts made and published by Angie's List on the Angie's website both deceived or were likely to deceive consumers and the public as to the kind and character of services sold and provided by Strauss; and/or consumer acceptance and satisfaction with and concerning those services, all to the injury of Strauss's business, reputation and standing as a provider of such services to consumers and the public.

79.   Such false and/or misleading statements of fact respecting the nature, characteristics and/or qualities of Strauss's services and/or commercial activities have caused actual and continuing injury to Strauss's commercial interest in the name and reputation of his business and in the sale and/or his reasonable expectations of/for the continuing sale of his services to consumers and the public.

80.   Strauss has suffered substantial economic harm and/or reputational injury as a direct and proximate result of the false and/or deceptive or misleading statements of fact made and published by Angie's List for the reason that such deception of consumers has caused them to withhold trade from Strauss.

## COUNT II
### (Unfair, Deceptive or Unconscionable Acts or Practices in Violation of §§ 4 and 5 of the Kansas Consumer Protection Act, K.S.A. §§ 50-626 and 50-627)

81.   Strauss restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1 through 80 hereinabove.

82.   Strauss is a consumer within the meaning of K.S.A. § 50-624(b) for the reasons, *inter alia*, that he has sought or acquired services from Angie's List for business purposes.

83.   The sale of advertising to Strauss by Angie's List and its advertisements, solicitations and/or promotions to consumers and the public, whether with respect to Strauss's

services or the services of other Service Providers, constitute consumer transactions within the meaning of K.S.A. § 50-624(c).

84.   Angie's List is a supplier within the meaning of K.S.A. § 50-624(l) for the reasons that, in the ordinary course of its business, it solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer.

85.   Angie's List has engaged in deceptive acts or practices in connection with consumer transactions with its advertisers within the meaning of K.S.A. § 50-626 for the reasons that it has, among other things:

      a.    Sold advertising, marketing and/or promotional services when it knew or had reason to know that such services would not have the characteristics, uses and/or benefits which it represented them to have;

      b.    Represented that such advertising, marketing and/or promotions would conform to standards of quality/usefulness in respect of which such services, as provided, were in truth materially deficient;

      c.    Represented that such advertising, marketing and/or promotions would have uses, benefits and/or characteristics of a kind and character represented by Angie's List when in truth and in fact, Angie's List possessed no reasonable basis for making any such representations;

      d.    Sold such advertising, marketing and/or promotional services through the willful use of exaggeration, falsehood, innuendo or ambiguity as to material facts;

      e.    In selling such advertising, failed, willfully, to state material facts or willfully concealed, suppressed or omitted material facts in the context of advertising, marketing and promotions made and published by Angie's List.

86.   In publishing advertising, marketing and/or promotional material directed to consumers regarding the goods or services offered by its advertisers, Angie's List has engaged in deceptive acts or practices for the reasons that, it has:

      a.    Made representations to consumers in the state of Kansas, knowingly or with reason to know that the services which it advertised would not have the characteristics, uses and/or benefits which it was alleged to have;

b.     Advertised, marketed and promoted services alleged to have a consumer-accepted standard of quality when such services, as provided, were materially deficient in that respect;

c.     Published advertising, marketing and/or promotions declaring that the services so advertised would have consumer-accepted benefits and/or characteristics of a kind and character represented by Angie's List when in truth and in fact, Angie's List possessed no reasonable basis for making any such representations;

d.     Published advertising, marketing and/or promotion through the willful use of exaggeration, falsehood, innuendo or ambiguity as to material facts;

e.     Failed, willfully, to state material facts or willfully concealed, suppressed or omitted material facts in the context of advertising, marketing and promotion which it made and published;

f.     Falsely and fraudulently disparaged the goods and services or business of Service Providers who had failed or refused to pay anything to Angie's List to advertise their services by claiming, to consumers and the public, that those Service Providers who had elected to become advertisers and had paid Angie's List for such advertising had received and were the subject of consumer approval, acceptance, endorsement and/or satisfaction and were to be preferred over all such persons.

87.     Through its solicitations and/or inducements to Service Providers to become advertisers on the Angie's website or otherwise, and through its electronic publication of advertisements or promotions for those Service Providers who have become its advertisers, Angie's List has engaged in unconscionable acts or practices:

a.     For all the reasons identified in ¶¶ 85 and 86 hereinabove;

b.     For the reason that it has made misleading statements of opinion regarding the kind and character of the goods or services offered by its advertisers and, in particular, that its advertisers had earned the rankings ascribed to them as a result of their history of consumer satisfaction, acceptance, approbation and endorsement when in truth and in fact, such advertisers had paid for whatever position of prominence they occupied.

**PRAYER FOR RELIEF**

Plaintiff Strauss, for himself and on behalf of all other classes of persons similarly situated, requests the following relief:

A.      That the Court make and enter its interim order directing Angie's List to preserve, keep, maintain and protect, in readily retrievable form, all documents and information, including electronically stored information, having relevance to this case or to any of the claims asserted herein;

B.      That the Court make and enter its order certifying this action as a class action under Fed. R. Civ. P. 23, defining the classes as requested herein, appointing the undersigned as Class Counsel and finding that plaintiff Strauss is a proper representative of each of the classes requested herein;

C.      That the Court make and enter its order awarding such preliminary and/or permanent injunctive relief as may be necessary or appropriate to protect the interests of the classes proposed herein including, without limitation, an order prohibiting Angie's List from engaging in any of the wrongful and/or unlawful acts described herein;

D.      That the Court make and enter its orders and judgments awarding plaintiff Strauss and the classes actual damages, punitive damages, treble damages, statutory damages, exemplary damages and equitable relief, whether in the nature of restitution or disgorgement of profits to the extent authorized and permitted by law;

E.      That the Court make and enter its orders and judgments granting plaintiff Strauss and the proposed classes such other or further relief as may be justified in the premises.

## DEMAND FOR JURY TRIAL

Plaintiff Strauss, for himself and all others situated similarly, demands trial by jury upon all issues properly triable by the same.

Respectfully submitted,

McDOWELL, RICE, SMITH & BUCHANAN


*/s/ James F.B. Daniels*
Corbyn W. Jones, *Pro Hac pending*
William C. Odle, KS Bar #14235
Michael J. Gorman, KS Fed. #70249
James F.B. Daniels, KS Fed. #70468
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 facsimile
cjones@mcdowellrice.com
wodle@mcdowellrice.com
mgorman@mcdowellrice.com
jdaniels@mcdowellrice.com

ATTORNEYS FOR PLAINTIFF