# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STEVE STRAUSS d/b/a CLASSIC TREE CARE, et al., | |
| **Plaintiffs,** | |
| **v.** | Case No. 2:17-CV-02560-HLT-TJJ |
| ANGIE'S LIST, INC., | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Steve Strauss filed this putative class action against Defendant Angie's List, Inc. asserting violations of the Lanham Act, 15 U.S.C. §§ 1501-114n (2012), and the Kansas Consumer Protection Act ("KCPA"), §§ 50-623 to -643 (West 2018). The claims hinge on allegations Defendant routinely engages in false advertising and deceptive trade practices through statements published on its website and other forms of media. Before the Court are: (1) Defendant's motion seeking dismissal of Plaintiff's Class Action Complaint ("Original Complaint") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6); and (2) Plaintiff Strauss's request for leave to file a First Amended Class Action Complaint ("Amended Complaint"). Docs. 11, 43.

The vast majority of Plaintiff Strauss's Lanham Act and KCPA claims are time-barred. Those that are not time-barred fail to satisfy at least one essential element of each claim. For these reasons, Plaintiff Strauss's well-pleaded allegations do not plausibly give rise to an entitlement to relief under the Lanham Act or KCPA and Defendant's motion to dismiss (Doc. 11) is granted. The Amended Complaint does not remedy the Original Complaint's shortcomings and Plaintiff Strauss's motion to amend (Doc. 43) is, therefore, denied. If permitted, Plaintiff Strauss's claims under the Amended Complaint would still be subject to immediate dismissal. The only remaining

claims would then be those of David Garner, the additional plaintiff sought to be added through the Amended Complaint ("Proposed-Plaintiff Garner"). Because the Court could not exercise personal jurisdiction over Defendant absent Plaintiff Strauss, the Amended Complaint is futile in its entirety. The Court's analysis of and conclusions regarding Defendant's motion to dismiss and Plaintiff Strauss's request for leave to amend are discussed at length below.

## I.     PROCEDURAL HISTORY

Plaintiff Strauss filed his Original Complaint on September 22, 2017, asserting: (1) false advertising claims under section 43(a) of the Lanham Act; and (2) unfair, deceptive, or unconscionable practices claims under sections 4 and 5 of KCPA. Doc. 1 ¶¶ 75-87; *see also* 15 U.S.C. § 1125 (2012); K.S.A. §§ 50-626, -627 (West 2018). He also seeks class certification of nationwide (Lanham Act) and Kansas-based (KCPA) claims. The Original Complaint contains seventy-four paragraphs of factual allegations—several of which include multiple subparagraphs—exclusive of the counts alleged and prayers for relief. *Id.* ¶¶ 1-75.

On November 20, 2017, Defendant moved to dismiss the Original Complaint under Rule 12(b)(6) on numerous grounds, including laches (Lanham Act claims), statute of limitations (KCPA claims), failure to plead with sufficient particularity as required by Rule 9(b) (Lanham Act and KCPA claims), and failure to plausibly plead one or more essential elements of the claim (Lanham Act and KCPA claims). Doc. 11 at 1-2; Doc. 12 at 9-27. Defendant's supporting memorandum is twenty-seven pages. Doc. 12 at 1-27. Plaintiff Strauss responded to the numerous issues raised in Defendant's motion to dismiss on December 26, 2017, in a fifty-four-page brief. Doc. 23 at 1-54. Defendant then filed its reply in a twenty-three-page brief on January 19, 2018. Doc. 25 at 1-23.

Almost two months after Defendant's motion to dismiss was fully briefed, on March 12, 2018, Plaintiff Strauss sought leave to amend his Original Complaint for purposes of joining Proposed-Plaintiff Garner. Doc. 43 at 1, 9. Plaintiff Strauss's Amended Complaint is nearly identical to his Original Complaint, save the specific factual allegations concerning Proposed-Plaintiff Garner's personal experience with Defendant and the addition of an individual claim on Proposed-Plaintiff Garner's behalf for unfair, deceptive, or unconscionable acts or practices under the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann. §§ 13-301 to -408 (West 2018). Doc. 43-1 ¶¶ 56-74, 109-115. The Amended Complaint does not alter any allegations against Defendant with respect to Plaintiff Strauss. *Compare* Doc. 1, with Doc. 43-1; *see also* Doc. 43 ¶¶ 41-43 (identifying Proposed-Plaintiff Garner's individual MCPA claim as the only new claim in the Amended Complaint). Defendant opposed Plaintiff Strauss's request to amend on April 11, 2018, in a twenty-seven-page brief, arguing largely that the amendment did not address the shortcomings of the Original Complaint and would therefore be futile as to Plaintiff Strauss, and that the Court would then lack jurisdiction over the only remaining plaintiff, Proposed-Plaintiff Garner. Doc. 47 at 9-14.[1] Plaintiff Strauss filed his thirty-two-page reply on April 27, 2018. Doc. 50.

In total, exclusive of tables of contents and authorities, the parties submitted over 270 pages for the Court's consideration in ruling on the pending motions. Docs. 1, 11-12, 23, 25, 43, 47, 50. The briefs raise numerous legal issues irrelevant to the Court's disposition of Defendant's motion to dismiss and Plaintiff Strauss's request for leave to amend. The factual allegations are also

---

[1] Defendant also attacked Proposed-Plaintiff Garner's substantive claims on the same basic grounds as Defendant attacked Plaintiff Strauss's claims in its previously filed motion to dismiss. *See generally* Doc. 47 at 14-27 (discussing Proposed-Plaintiff Garner's substantive claims).

voluminous, and many are immaterial to the Court's ultimate legal conclusions. Those allegations that are relevant to the Court's ruling on the pending motions are collected and distilled below.

## II.    BACKGROUND

The following facts are taken from the well-pleaded allegations of the Original Complaint and, consistent with the well-established standards for evaluating motions to dismiss under Rule 12(b)(6), the Court assumes the truth of these facts for purposes of analyzing Defendant's motion to dismiss. Facts unique to the Amended Complaint but necessary to the Court's consideration of Plaintiff Strauss's request for leave to amend are identified as such.

### A.    Defendant's General Business Practices

Defendant is a corporation organized under Delaware state law. Doc. ¶ 2. It has its principal place of business in Indianapolis, Indiana, and is licensed to conduct business in Kansas. *Id.* Defendant, in fact, conducts business in Kansas. *Id.* Since its establishment in 1995, Defendant has become one of the leading internet-based consumer ratings services. *Id.* ¶¶ 6, 13. It primarily serves consumers through its website,[2] which it markets as a forum for the viewing and posting of first-hand, consumer-generated reviews of service providers. *Id.* At its most basic level, Defendant's website functions as a search engine. *Id.* ¶¶ 15, 18-22. A consumer in need of goods or services can search Defendant's website and rely on the actual experience of other consumers— displayed on the website through a letter-grade rating and narrative reviews—to identify the service provider best suited to assist with the consumer's needs. *Id.* ¶¶ 6, 13, 15, 17-22.

Consumers are led to believe that a search of Defendant's website will return a list of potential service providers, in ranked order, based on the first-hand experience of other consumers. *Id.* ¶¶ 6-7, 10-11, 13, 15, 17-22. But the order in which Defendant displays service providers within

---

[2] Defendant's website can be accessed at the URL www.angieslist.com. Doc. 1 ¶ 6.

search results is not based solely on consumer-generated ratings and reviews. *Id.* ¶¶ 8-9, 12, 15, 23-25. Defendant also receives substantial revenue from providing advertising services to service providers who appear on its website. *Id.* ¶¶ 6, 14, 61-64. And whether a service provider pays Defendant to advertise directly affects its position within search results. *Id.* ¶¶ 8-9, 12, 15, 23-25, 62-63. An advertising (i.e., fee-paying) service provider is listed at the top of search results and may be listed above a non-advertising (i.e., non-fee-paying) service provider—even if the non-advertising service provider has a higher rating and better reviews. *Id.* But Defendant does not make this clear to consumers. *Id.*

Defendant's general advertising misleads consumers. *Id.* ¶¶ 11, 18. Through advertising and promotion of its business, Defendant represents to consumers that "[c]ompanies cannot pay to be on [Defendant's website]" and that service providers "don't pay" to be on Defendant's website. *Id.* ¶¶ 11(a)-(b). Defendant touts itself as a business driven by a "consumer first philosophy" and an "unwavering commitment" to place "the interests of the consumer first." *Id.* ¶ 11(c). It advertises its website as the place where consumers can find the service provider best suited to satisfy their needs. *Id.*

In Defendant's Membership Agreement, which fee-paying consumers must sign to access the full benefits of Defendant's website, Defendant states that the ratings and reviews displayed on Defendant's website are "based upon the actual first-hand experiences [consumers] have had with [service providers]." *Id.* ¶ 17. Defendant's website FAQs also state that a service provider's position in search results is determined by their recent grades and number of reviews and companies with the best ratings will appear first. *Id.* ¶ 21. Companies with a poor rating will appear lower on the list after businesses who have earned good ratings for superior work. *Id.* ¶ 22.

In reality, search list order or ranking is not based purely on consumer ratings and reviews. *Id.* ¶¶ 8-9, 12, 15, 23-25, 62-63. Service providers can artificially manipulate where they appear in search results by paying to advertise with Defendant. *Id.* Defendant's marketing materials directed to service providers reflect this disparity. *Id.* ¶¶ 12, 24, 62. Service providers are clearly told that advertising on Defendant's website "exponentially increases [their] exposure to [consumers] . . . ." *Id.* ¶ 24(a). More specifically, Defendant markets premium advertising options that allow service providers to "[a]ppear on the first page of search results so members can easily find and access [their] review[s]." *Id.* ¶ 24(c).

**B.      Plaintiff Strauss's Relationship and Experience with Defendant**

Plaintiff Strauss is a Kansas resident. *Id.* ¶ 1. He is the sole proprietor of a tree removal, trimming, pruning, and stump grinding business. *Id.* ¶ 31. Plaintiff Strauss is an example of the type of service provider commonly listed on Defendant's website. *Id.* ¶¶ 6, 31, 33. Since 2005, Plaintiff Strauss has been aware of Defendant's advertising services and his ability to affect his ranking in search results on Defendant's website if he paid for such services. *Id.* ¶¶ 33, 35. Plaintiff Strauss and Defendant entered into advertising agreements each year between 2005 and 2016. *Id.* ¶ 34. During this time, Plaintiff Strauss paid Defendant more than $200,000.00 in advertising fees and coupon retention percentages in an effort to appear higher in search results for arborists and tree removal or tree care businesses on Defendant's website. *Id.* ¶¶ 33-34.

Before 2013, Plaintiff Strauss and Defendant had an amicable relationship, particularly during the fall and winter of 2011, when Plaintiff Strauss advertised under Defendant's Big Deal Coupon program. *Id.* ¶¶ 33-47. This program was particularly appealing to Defendant, who shared in 25% of the gross revenues Plaintiff Strauss received for each Big Deal Coupon redeemed by a consumer. *Id.* ¶¶ 35-38. In 2012, however, Plaintiff Strauss discontinued advertising the Big Deal Coupon, and its relationship with Defendant began to sour. *Id.* ¶¶ 39-41. For a period of three

months in late 2013, Plaintiff Strauss was completely excluded from search results on Defendant's website—purportedly due to a criminal background check that revealed a misdemeanor, which was later deemed to be an error. *Id.* ¶¶ 41-45. Plaintiff Strauss ultimately engaged legal counsel to resolve the dispute, Defendant offered an apology, and Plaintiff Strauss began to reappear in search results. *Id.* ¶ 46. During the three-month intervening period, however, it was conveyed to consumers through a message on Defendant's website that Plaintiff Strauss either had not met the requisite qualifications to appear on Defendant's website or had "no ratings or reviews." *Id.* ¶ 42. From 2013 to 2016, Plaintiff Strauss appeared in search results, but Defendant intentionally "buried" Plaintiff Strauss within the list despite Plaintiff Strauss having received numerous favorable consumer-generated ratings and reviews. *Id.* ¶¶ 48-49. In the fall of 2016, Defendant failed to honor its obligations to Plaintiff Strauss under their most recent advertising agreement. *Id.* ¶ 50. Since 2016, Plaintiff Strauss has not advertised on Defendant's website. *Id.* ¶ 34.

Defendant has falsely described, disparaged, and defamed Plaintiff Strauss and his business and services by declaring to consumers who search Defendant's website that: (1) Plaintiff Strauss has "no rating or [consumer] reviews"; (2) has not met certain "criteria" to be listed on Defendant's website; and (3) has no "local offers" to extend to consumers.[3] *Id.* ¶ 52. In reality, Plaintiff Strauss has many favorable ratings and reviews, has more than satisfied Defendant's published criteria for being listed on Defendant's website, and has several local offers to extend consumers. *Id.*

---

[3] Neither the Original Complaint nor the Amended Complaint contains dates for these allegations. Doc. 1 ¶ 52; Doc 43-1 ¶ 54.

## C. Proposed-Plaintiff Garner's Relationship and Experience with Defendant[4]

Proposed-Plaintiff Garner is a resident of Maryland. Doc. 43-1 ¶ 2. He is the sole proprietor of a roofing, siding, and guttering business in Maryland, doing business as Garner Roofing Company, LLC ("Garner Roofing"). *Id.* ¶¶ 2, 56. Garner Roofing is another example of the type of service provider commonly listed in search results on Defendant's website. *Id.* ¶¶ 8, 56. Since 2012, Proposed-Plaintiff Garner has been aware of Defendant's advertising services. *Id.* ¶ 57. Between 2012 and 2017, Proposed-Plaintiff Garner and Defendant entered into advertising agreements. *Id.* From 2012 to 2014, Proposed-Plaintiff Garner and Defendant had an amicable relationship and, each year during that time, Proposed-Plaintiff Garner was awarded a Super Service Award by Defendant for achieving and maintaining "a superior rating" on Defendant's website. *Id.* ¶¶ 58-59.

In January 2018, Proposed-Plaintiff Garner notified Defendant he did not intend to utilize Defendant's advertising services after that date. *Id.* ¶¶ 60-62. Defendant attempted to persuade Proposed-Plaintiff Garner to change his mind, but he declined. *Id.* ¶¶ 63-66. Despite Proposed-Plaintiff Garner's immediately-effective notice of cancelation, Defendant continued to charge him for advertising services during the nine-day period that Defendant attempted to persuade Proposed-Plaintiff Garner to change his mind and an additional six-day period Defendant attributed to a processing delay. *Id.* ¶¶ 67-72. Proposed-Plaintiff Garner disputed the additional charge, refusing to pay for services subsequent to his first notice of cancellation, but Defendant insisted he was responsible for the cost of additional advertising during that time period. *Id.* ¶¶ 70-72. Defendant also notified Proposed-Plaintiff Garner that, as a result of the dispute and his refusal to pay, it had

---

[4] The facts contained in Part II.C. of this Order are unique to the Amended Complaint, but necessary to the Court's consideration of Plaintiff's request for leave to amend. All other facts are taken from the Original Complaint.

appended a "Non-Pay Exclusion" to his business profile on Defendant's website, informing consumers that Proposed-Plaintiff Garner owed Defendant unpaid sums of money. *Id.* ¶ 73. Defendant also allowed a single consumer to submit a duplicative negative review of Proposed-Plaintiff Garner, assigning him the lowest possible rating, and removed from its website all references to Proposed-Plaintiff Garner's previously-earned Super Service Awards. *Id.* ¶ 74.

### D. Defendant's Revenue Derived from Advertising

Defendant derives most of its revenue from advertising (fee-paying) service providers. *Id.* ¶ 61. "In 2011, 2012, 2013, and 2014, Defendant derived 62%, 69%, 73%, and 76.8% of its total revenue, respectively, not from its consumers/members but from [advertising (fee-paying) service providers]." *Id.* For example, in 2014, Defendant made approximately $241,900,000.00 from agreements with advertising (fee-paying) service providers—more than three times its revenue derived from consumer membership fees. *Id.* "Recognizing this, in June of 2016, [Defendant] instituted a 'freemium' model, offering a bare-bones free membership [to consumers]" in addition to its "Silver" and "Gold" plans. *Id.* "This new course of business provided even further incentive [for Defendant] to extract more advertising revenue from service providers to compensate for the loss of [fee-paying consumers]." *Id.* Defendant's "economic fortunes are aligned far more with [s]ervice [p]roviders than consumers." *Id.*

## III. MOTION TO DISMISS

Defendant seeks dismissal of Plaintiff Strauss's Lanham Act and KCPA claims in the Original Complaint on several grounds. Relevant to the Court's ruling are three of Defendant's contentions. First, Defendant asserts that Plaintiff Strauss cannot establish at least one essential element of his Lanham Act false advertising claim because the representations on which Plaintiff Strauss's claims are based do not constitute "commercial advertising or promotion." Second, Defendant asserts that Plaintiff Strauss cannot establish his KCPA claims because he has not

plausibly pled the essential elements of reliance or causation. Third, Defendant asserts as an affirmative defense that Plaintiff Strauss's Lanham Act and KCPA claims are all time-barred—the Lanham Act claims by the doctrine of laches and the KCPA claims by the applicable statute of limitations. Because the Court concludes that the vast majority of Plaintiff Strauss's claims are barred by either laches or the applicable statute of limitations, the Court addresses these issues first. The Court then considers Defendant's request to dismiss Plaintiff Strauss's remaining claims—i.e., his remaining timely claims—for failure to plausibly plead at least one essential element of each claim.

### A. Standard of Review

Under Rule 12(b)(6), to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's claim is facially plausible if he pleads sufficient factual content to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

This standard results in two principles that underlie a court's analysis. *Id.* First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Stated differently, though the court must accept well-pleaded factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S.

at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)(2) (original brackets omitted)). "In keeping with these [two] principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

### B.    Affirmative Defenses of Laches and Statute of Limitations

Defendant contends Plaintiff Strauss's Lanham Act and KCPA claims under the Original Complaint are time-barred—the Lanham Act claims under a laches theory and the KCPA claims by the applicable statute of limitations. Doc. 12 at 19-20, 26-27. Both laches and statute of limitations are affirmative defenses; however, when the factual allegations and dates alleged in the complaint "make clear that the right sued upon has been extinguished, this issue may be resolved on a motion to dismiss." *Thompson v. Jiffy Lube Int'l, Inc.*, 505 F. Supp. 2d 907, 924 (D. Kan. 2007); *see also Dummar v. Lummis*, 543 F.3d 614, 619 (10th Cir. 2008) (restating holding from *Jiffy Lube*); *United States v. Rodriguez-Auirre*, 264 F.3d 1195, (10th Cir. 2001) (considering both laches and statute of limitations defenses at motion to dismiss phase). The Court, in large part, agrees with Defendant. The vast majority of Plaintiff Strauss's Lanham Act and KCPA claims are time-barred.

### 1.    Plaintiff Strauss's Lanham Act Claims

Count I of the Original Complaint alleges Defendant engaged in false advertising in violation of section 43(a) of the Lanham Act. Doc. 1 at 32-33. Section 43(a) imposes liability against any individual or entity who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographical origin of his or her or another person's goods,

services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B) (2012). The Lanham Act does not contain a statute of limitations, but it "expressly provides for defensive use of 'equitable principles, including laches.'" *Petrella v. Metro-Goldwin-Mayer, Inc.* 572 U.S. 663, ___ n.15, 134 S. Ct. 1962, 1979 n.15 (2014) (quoting 15 U.S.C. § 1115(b)(9) (2012)). This includes Lanham Act claims for false advertising under section 43(a). *See, e.g.*, *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 827 (7th Cir. 1999) (affirming dismissal of Lanham Act false advertising claims on grounds of laches); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir. 1996) (same).

Similar to a statute of limitations, laches functions as a temporal limitation on a party's right to sue. *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1090 (10th Cir. 2014). "It stems from the principle that 'equity aids the vigilant and not those who slumber on their rights.'" *Id.* at 1090-91 (quoting *Kansas v. Colorado*, 514 U.S. 673, 687 (1995)). "Laches bars a claim when there is: (1) lack of diligence by the [plaintiff], and (2) prejudice to the [defendant]." *Id.* at 1091 (internal quotations and citations omitted). Although it is a separate defense, the determination of whether laches applies is made with reference to the most analogous state statute of limitations. *Yeager v. Fort Knox Security Prods.*, 602 F. App'x 423, 431 (10th Cir. 2015); *see also Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 135 (3d Cir. 2005) ("Courts commonly use the appropriate statute of limitations as a guideline in claims for false advertising under § 43(a) of the Lanham Act."); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (stating laches determination is made with reference to analogous state statute of limitations period). In dealing with Lanham Act claims, courts have applied a "strong presumption . . . that if a § 43(a) claim is filed within the analogous state limitations period, . . . laches is inapplicable; if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." *Jarrow Formulas*, 304 F.3d at 837; *see also Lyons*

*P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001); *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997); *Hot Wax*, 191 F.3d at 821; *Conopco*, 95 F.3d at 191; *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365–66 (6th Cir. 1985); *Univ. of Pittsburgh v. Champion Prods. Inc.*, 686 F.2d 1040, 1045 (3d Cir. 1982).[5]

In light of the above, to determine whether laches applies to bar Plaintiff Strauss's Lanham Act claims, the Court must: (1) identify the most analogous state statute of limitations; (2) determine whether Plaintiff Strauss's Lanham Act claims were filed before or after the expiration of the applicable limitations period; (3) determine whether a presumption in favor of or against application of laches exists; and (4) in light of the presumption or lack thereof, determine whether there was a lack of diligence by Plaintiff Strauss in filing suit that has resulted in prejudice to Defendant. Each of these issues is addressed in turn below.

### a.    Determination of the Analogous State Statute of Limitations

When identifying the state statute of limitations most analogous to Lanham Act false advertising claims, several courts have referred to the state statute applicable to fraud claims. *See, e.g.*, *Conopco*, 95 F.3d at 191-92 (affirming district court's reference to state statute of limitations for fraud claims); *Jarrow Formulas*, 304 F.3d at 838 (applying California statute of limitations for fraud claims); *Albion Int'l Inc. v. Am. Int'l Chem., Inc.*, 2012 WL 3776866, at *7-9 (D. Utah Aug. 30, 2012) (referring to Utah statute of limitations for fraud claims).[6] Kansas law provides

---

[5]  The Tenth Circuit has also recognized this presumption. *See Yeager*, 602 F. App'x at 431 ("In dealing with Lanham Act claims courts have looked to analogous state limitation provisions and invoked presumptions in favor of (or against) laches defenses to claims brought outside (or inside) the analogous limitations period.") (citing *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1246-47 (9th Cir. 2013); *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir.2011); *Maloney-Crawford Tank Corp. v. Rocky Mountain Nat'l Gas Co.*, 494 F.2d 401, 404 (10th Cir.1974) (noting presumptions favoring/disfavoring laches by reference to analogous state limitations period in patent infringement case)).

[6]  Defendant, consistent with the cited authority, contends Kansas's statute of limitations for fraud claims is most analogous. Doc. 12 at 19-20. Plaintiff Strauss does not argue a different statute of limitations is more analogous to his own Lanham Act claims. Doc. 23 at 52-53. Rather, he contends that because a different statute of limitations might be more analogous to the Lanham Act claims of a different, non-Kansas plaintiff if a nationwide class is

13

that fraud claims must be filed "within two years of discovering the fraud if the plaintiff suffered ascertainable injury at the time; if not, the plaintiff must file within two years of when substantial injury resulting from the fraud is reasonably ascertainable." K.S.A. § 60-513(a)(3) (West 2018).

> **b. Determination of Whether Plaintiff Strauss's Lanham Act Claims were Filed Before or After the Expiration of the Applicable Limitations Period**

Plaintiff Strauss filed his Original Complaint on September 22, 2017. *See generally* Doc. 1. Based on that filing date, the look-back period for Kansas's two-year fraud statute of limitations is September 22, 2015—assuming Plaintiff Strauss had suffered ascertainable injury at that time. But determining whether Plaintiff Strauss's Lanham Act claims fall within this look-back period is not a straight-forward affair. Defendant's Lanham Act violations with respect to Plaintiff Strauss can be divided into two distinct categories: (1) falsely and/or fraudulently representing to consumers that service providers are ranked within search results on Defendant's website based

---

eventually certified, Kansas's fraud statute of limitations should not be considered with reference to his own Lanham Act claims. *Id.* Alternatively, he argues the most plaintiff-friendly fraud statute of limitations in the nation (fifteen years) should be applied to the Lanham Act claims of all putative class members, including his own. *Id.* Plaintiff cites no legal authority supporting either contention. Therefore, consistent with the views of its sister-courts, the Court finds Kansas's fraud statute of limitations is the most analogous to Plaintiff Strauss's individual Lanham Act claims.

Moreover, to the extent Plaintiff Strauss contends the Court cannot consider a dispositive motion—or an affirmative defense that is dispositive of certain claims—before determining class certification, such contention is misguided. The advisory committee notes to Rule 23 (governing class certification) specifically note that "[t]he party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified." FED. R. CIV. P. 23 advisory committee's note to 2003 amendment. Courts often decide class certification before ruling on dispositive motions, but part of determining the most "early practicable time" when that decision can be made—as required by Rule 23—is deciding if "the suit can quickly be shown to be groundless," which may lead a court "to skip certification and proceed directly to the merits." *Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013) (citation omitted). To do otherwise and require "notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake." *Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984) (holding there is no "broad rule that in all cases the determination of the propriety of a class action must precede any consideration of the merits"). This approach is in line with that of other district courts. *See, e.g.*, *McNulty v. Fed. Hous. Fin. Agency*, 954 F. Supp. 2d 294, 298 (M.D. Pa. 2013) (ruling on the defendants' motion to dismiss before determining class certification "in the interest of efficiency and economy"); *Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 268 (E.D.N.Y. 2014) (declining to reach certification question because the defendants were entitled to judgment as a matter of law on all asserted claims); *Guam Contractors Ass'n v. Sessions*, 2017 WL 3161682, at *2 (D. Guam July 25, 2017) (staying class certification issue until the defendants' motion to dismiss and other dispositive motions were resolved).

purely on consumer-generated ratings and reviews; and (2) publishing false, fraudulent and/or misleading statements of fact about Plaintiff Strauss as a service provider. Careful consideration of the timeline applicable to these alleged violations is imperitive because, as is the case with many Lanham Act claims, this alleged conduct was on-going, spanning several years.

i.      **Defendant's Alleged Misrepresentations to Consumers Regarding Rankings of Service Providers within Search Results on its Website**

Plaintiff Strauss has been aware of the ability of service providers to manipulate their placement within search results on Defendant's website since 2005. This is plain from the allegations of his Original Complaint. Plaintiff Strauss was not only aware of Defendant's practice of placing advertising (fee-paying) service providers higher in search results, he personally took advantage of the practice from 2005 to 2016 by engaging Defendant's advertising services. During this time, Plaintiff Strauss paid Defendant more than $200,000.00 in advertising fees and coupon retention percentages to appear higher in search results. He can hardly claim he was unaware of the practice before September 22, 2015—the cutoff date for the two-year look-back period. The question then, is whether Plaintiff Strauss's damages alleged to have resulted from this practice were reasonably ascertainable before September 22, 2015.

To the extent Plaintiff Strauss seeks damages based on the general theory that he spent money to advertise and be placed higher in search results and is now disgruntled about having made that expenditure, those damages were ascertainable before September 22, 2015. As noted, the money spent on advertising fees and coupon retention percentages was expended for over a decade, between 2005 and 2016. The fact that Plaintiff Strauss only became disgruntled about the practice after he elected to stop advertising with Defendant does not alter the conclusion as to when

the alleged damages were ascertainable.[7] Plaintiff Strauss also seeks damages for the period of

2013 to 2016, based on allegations Defendant intentionally but unjustifiably "buried" him within

search results during this time period. The allegations of Plaintiff Strauss's Original Complaint

make clear Plaintiff Strauss was aware this was occurring as early as 2013. These damages were

also reasonably ascertainable before September 22, 2015.[8]

### ii. Defendant's Alleged False Statements of Fact about Plaintiff Strauss on its Website

Plaintiff Strauss also alleges damages arising out of statements of fact Defendant published

on its website about Plaintiff Strauss as a service provider. For a three-month period in 2013,

Defendant removed Plaintiff Strauss from its website entirely and falsely conveyed to consumers

that Plaintiff Strauss either had not met the requisite qualifications to appear on Defendant's

website or had "no ratings or reviews." The reason for this publication is in dispute, but the period

during which it occurred is not. Any damages resulting from this statement on Defendant's

website—displayed for three months in 2013—were reasonably ascertainable well before

September 22, 2015.

Plaintiff Strauss's remaining claims based on Defendant's alleged false, fraudulent, and/or

misleading statements of fact about Plaintiff Strauss on its website are not a model of clarity.

Plaintiff Strauss alleges Defendant breached their existing advertising agreement in the fall of 2016

---

[7] Plaintiff does not argue—and, thus, the Court does not consider—whether the "continuing violations" theory would apply to bar monetary relief only for damages incurred before expiration of the limitations period—i.e., prior to September 22, 2015—leaving Plaintiff Strauss free to pursue damages incurred after September 22, 2015, even if based on the same wrongful conduct. Arguments not raised are waived and will not be considered. *Logsdon v. AT&T Commc'ns of Sw., Inc.*, 2003 WL 1872993, at *1 (D. Kan. Apr. 10, 2003) (citing *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1278 (10th Cir. 2003); *Coleman v. B-G Maint. Mgmt.*, 108 F.3d 1199, 1205 (10th Cir.1997)). The Court notes, however, that application of the continuing violations theory in the context of laches and Lanham Act claims for false advertising appears to be disfavored. *See, e.g.*, *Jarrow Formulas*, 304 F.3d at 837; *Hot Wax*, 191 F.3d at 821-22; *Icon Health & Fitness v. Nautilus Grp.*, 2004 WL 6031124, at *19-20 (D. Utah Dec. 21, 2004).

[8] The Court's discussion of the "continuing violation" theory, discussed *supra* at footnote 7, is equally applicable to this category of damages.

and he has not advertised on Defendant's website since 2016. In the subsequent paragraph of the Original Complaint, Plaintiff Strauss alleges Defendant has falsely described, disparaged, and defamed Plaintiff Strauss and his business and services by declaring to consumers who search Defendant's website that: (1) Plaintiff Strauss has "no rating or [consumer] reviews"; (2) has not met certain "criteria" to be listed on Defendant's website; and (3) has no "local offers" to extend to consumers. Plaintiff Strauss does not include a specific date as to when these statements appeared on Defendant's website, but the Court finds it is reasonable to infer—based on the immediately preceding paragraph in the Original Complaint—that these statements began appearing on Defendant's website in 2016 (the "2016 Website Statements").[9] The Court therefore concludes that damages resulting from the 2016 Website Statements were <u>not</u> reasonably ascertainable before September 22, 2015. For this reason, Plaintiff Strauss's Lanham Act claims based on the 2016 Website Statements are <u>not</u> barred by laches and are, therefore, subject to further analysis, *infra* at Part III.C.1.

---

[9] The Court notes that Defendant raises the issue of whether Plaintiff Strauss's Lanham Act and KCPA claims are insufficiently pled because they sound in fraud and must meet the stricter pleading requirements of Rule 9(b). Doc. 12 at 9-16, 21-25. Plaintiff Strauss urges the Court to apply Rule 8(a)'s more lenient pleading requirements, arguing Rule 9(b) does not apply to Lanham Act and KCPA claims. Doc. 23 at 28-32, 44-49. Alternatively, Plaintiff Strauss argues he has met the heightened pleading requirements of Rule 9(b). Doc. 23 at 44-49. The Court considers it a fact-based inquiry and would apply Rule 9(b)'s heightened pleading requirements to both Lanham Act and KCPA claims "only insofar as the factual averments allege intentional or knowing misrepresentations." *Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.*, 2018 WL 3122172, at *6-7 (D. Kan. June 26, 2018). A thorough reading of the Original Complaint confirms Plaintiff Strauss has alleged Defendant engaged in knowing and intentional misrepresentations. It is only the allegations related to the 2016 Website Statements—paragraph fifty-two of the Original Complaint—that fail to meet Rule 9(b)'s heightened pleading requirements. As noted, the Court concludes it is a reasonable inference that the 2016 Website Statements—which appear in paragraph fifty-two of the original complaint—when read in tandem with the immediately preceding paragraph fifty-one, did occur in 2016. Given the Court's ultimate conclusion, discussed *infra* Part III.C., that these factual allegations cannot support a Lanham Act or KCPA claim even with the benefit of an inference as to when they occurred, Defendant suffers no prejudice.

### c. Application of Presumption and Determination of Whether there was Lack of Diligence by Plaintiff Strauss in Filing Suit and Resulting Prejudice to Defendant

Having determined that the vast majority of Plaintiff Strauss's Lanham Act claims fall outside the analogous two-year statute of limitations, the Court finds no reason to avoid the presumption in favor of application of laches.[10] *See* discussion *supra* at Part III.B.1. Plaintiff Strauss offers no authority or argument against the presumption in favor of laches where the alleged wrongful conduct falls outside the analogous statute of limitations.[11]

The only remaining inquiry, therefore, is whether there was a lack of diligence by Plaintiff Strauss in filing suit that resulted in prejudice to Defendant. *Biodiversity Conservation*, 762 F.3d at 1091. The "lack of diligence" element is met when the delay is "inexcusable, unreasonable, or undue." *Id.* (internal quotations and citations omitted). Plaintiff Strauss offers no excuse for his delay in filing suit, and the Court cannot find one amongst the well-pleaded allegations of his Original Complaint.

Plaintiff Strauss cannot claim he delayed in filing because he was unaware of Defendant's practices. He has been aware of Defendant's practices for more than a decade before the filing of this lawsuit. He was not only aware of Defendant's business practices, he took advantage of them by entering into advertising agreements with Defendant dating back to 2005 in a concerted effort to improve his placement in search results on Defendant's website. *See* discussion *supra* at Part III.B.1.b.i. And the fact that he only recently terminated his relationship with Defendant in 2016 does not excuse more than a decade of having "slumbered on his rights."

---

[10] The Court does <u>not</u> apply laches to Plaintiff Strauss's Lanham Act claims arising out of the 2016 Website Statements. *See supra*, Part III.B.1.b.ii. Those claims fall inside the analogous two-year statute of limitations and are specifically excluded from the Court's analysis in Part III.B.1.c. Plaintiff Strauss's Lanham Act claims based on the 2016 Website Statements are further analyzed in Part III.C.1.

[11] Plaintiff Strauss's only responses to Defendant's laches defense are discussed *supra* at footnote 6.

Whether there is resulting prejudice to Defendant, therefore, remains the only unresolved issue.[12] Courts generally recognize two types of prejudice justifying application of laches: (1) evidentiary; and (2) economic. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001). Evidentiary prejudice may be found in the case of "lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Id.* "Economic prejudice may arise where a defendant . . . will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1360 (Fed. Cir. 2008) (internal quotations and citations omitted); *accord Biodiversity Conservation*, 762 F.3d at 1091 (stating the "prejudice" element is met where "the defendant has expended substantial time and effort during the delay that the [plaintiff's] claim could defeat").

Although Defendant makes a passing reference to the prejudice it might suffer if required to undertake discovery of materials pre-dating the limitations period, there is insufficient evidence from which the Court could conclude—at the motion to dismiss phase—that allowing Plaintiff Strauss to proceed on his Lanham Act claims would result in evidentiary prejudice to Defendant.[13] The Original Complaint does, however, establish economic prejudice to Defendant.

The Original Complaint alleges that Defendant derives most of its revenue from the very business practices that Plaintiff Strauss now complains violate the Lanham Act. Plaintiff Strauss

---

[12] Plaintiff Strauss also does not deny—or attempt to address—the prejudice to Defendant resulting from his delay in filing suit.

[13] Footnote 10 of Defendant's supporting memorandum discusses briefly a Central District of California case in which the court concluded the defendant would be prejudiced if required to defend a Lanham Act claim predating the analogous state statute of limitations, in part because it would have to conduct discovery that predated the limitations period. *See* Doc. 12 at 21 n.10 (citing *Lifeway Foods, Inc. v. Millennium Prods.*, 2016 WL 7336721, at *3 (C.D. Cal. Dec. 14, 2016)). The Court has read and considered the *Lifeway Foods* case but does not find it persuasive here. To conclude that discovery in this matter would result in material prejudice to Defendant would require the Court to draw several inferences in Defendant's favor from the well-pleaded allegations of the Original Complaint— an approach that is inappropriate in considering a motion to dismiss. *See* discussion of Rule 12(b)(6) standard, *supra* at Part III.A.

specifically avers that, in each of the years from 2011 to 2014, more than sixty percent of Defendant's revenue was derived from its advertising relationships with service providers. By 2014—between eight and nine years into Plaintiff Strauss's relationship with Defendant—Defendant had begun to focus its business model on its advertising services to the extent that the revenue from this aspect of its business was three times the revenue derived from consumer membership fees. Two years later, Defendant made the decision to further focus its business model on its advertising relationships with service providers when it began offering consumers free, non-membership access to its website. All of these changes to Defendant's business model occurred during the time Plaintiff Strauss was aware of Defendant's business practices but failed to bring suit. Allowing Plaintiff Strauss to proceed on his Lanham Act claims after over a decade would defeat the substantial time and effort Defendant has expended toward these significant adjustments to its business model during the delay, resulting in economic prejudice to Defendant. The Court concludes laches applies to bar all Plaintiff Strauss's Lanham Act claims except those based on the 2016 Website Statements, which are further discussed *infra* at Part III.C.1.

### d.      Plaintiff Strauss's KCPA Claims

Plaintiff Strauss also asserts a claim for unfair, deceptive, or unconscionable acts or practices in violation of sections 4 and 5 of KCPA. Doc. 1 ¶¶ 81-87. KCPA imposes liability against "supplier[s]"[14] that engage in any deceptive or unconscionable act or practice in connection with a consumer transaction. K.S.A. §§ 50-626, -627 (West 2018). Unlike the Lanham Act, there is a specific statute of limitations that applies to KCPA claims. "KCPA has a three-year statute of

---

[14] KCPA defines "supplier" as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." K.S.A. § 50-624 (West 2018). It excludes from the definition "any bank, trust company or lending institution which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank, trust company or lending institution." *Id.*

limitations, which starts running with the occurrence of the alleged conduct constituting the violation, not the discovery of the violations." *Louisburg Bldg. & Dev. Co. v. Albright*, 252 P.3d 597, 607 (Kan. Ct. App. 2011). The Court therefore calculates the look-back period for this statute of limitations as September 22, 2014—three years before the filing of the Original Complaint.

The same factual allegations that underlie Plaintiff Strauss's Lanham Act claims support his KCPA claims. And the one-year difference between the look-back period for Plaintiff Strauss's KCPA and Lanham Act claims does not alter the Court's conclusion. Plaintiff Strauss's KCPA claims are time-barred, with the exception of those claims based on the 2016 Website Statements.

The representations Defendant made to consumers about service providers' rankings within search results on Defendant's website all date back to 2005—well before expiration of the three-year look-back period on September 22, 2014. Plaintiff Strauss's well-plead claims regarding the statements of fact Defendant published on its website about Plaintiff Strauss fare no better. These statements appeared on Defendant's website for a three-month period in late 2013. Even though this occurred at the end of the calendar year in 2013, it was still nine months before expiration of the look-back period on September 22, 2014.[15] As was the case in the Court's analysis of laches, Plaintiff Strauss's remaining KCPA claims based on Defendant's 2016 Website Statements occurred within the look-back period, are not time-barred, and are subject to further analysis, *infra* at Part III.C.2. With the exception of those claims based on the 2016 Website Statements, the Court concludes Plaintiff Strauss's KCPA claims are barred by the applicable statute of limitations.

---

[15] As is the case with his Lanham Act claims, Plaintiff Strauss does not argue that the "continuing violations" theory, discussed *supra* at footnote 7, applies to his KCPA claims. Arguments not raised are waived and will not be considered. *Logsdon*, 2003 WL 1872993, at *1 (citations omitted).

**C.      Failure to Plausibly Plead an Essential Element of Each Remaining Claim**

Plaintiff Strauss's only remaining claims that are not time-barred are those based on the 2016 Website Statements. Defendant also seeks dismissal of Plaintiff Strauss's Lanham Act and KCPA claims on the merits, arguing Plaintiff Strauss has failed to plausibly plead one or more essential elements of his Lanham Act and KCPA claims. The Court agrees. Plaintiff Strauss's remaining claims do not plausibly give rise to an entitlement to relief under either the Lanham Act or KCPA.

**1.      Plaintiff Strauss's Remaining Lanham Act Claims**

To state a claim for false advertising under the Lanham Act, a plaintiff must plead the following elements:

> (1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) [injury to] the plaintiff.

*Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) (internal citations omitted); *accord Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000). Defendant argues Plaintiff has failed to plead the required elements in multiple respects, but relevant to the Court's analysis is the requirement within the first element that the representations made by the defendant be in connection with "commercial advertising or promotion."

The Tenth Circuit has adopted a four-prong test to determine whether a defendant's representations constitute "commercial advertising or promotion" for purposes of a Lanham Act false advertising claim. *Proctor & Gamble*, 222 F.3d at 1273-74. To constitute "commercial advertising or promotion," the representations at issue "must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing

consumers to buy defendant's goods or services . . . [; and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Id.* (quoting *Gordon & Breach Sci. Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. Aug. 15, 1994) (internal quotations omitted). Defendant contends Plaintiff Strauss's Lanham Act claims falter at prong three of the *Proctor & Gamble* test—he cannot establish the 2016 Website Statements were made for purposes of influencing consumers to buy Defendant's goods or services. At best, Plaintiff Strauss has plausibly pled that the 2016 Website Statements influenced consumers to buy the goods or services of a tree care business other than Plaintiff Strauss, but not the goods or services of Defendant.

Plaintiff Strauss, on the other hand, argues it is sufficient that the 2016 Website Statements influenced consumers to buy goods or services from other tree care businesses. And because Defendant received "referral fees" from those other tree care businesses (in the form of advertising fees or coupon retention percentages), Defendant is an actual "competitor" of Plaintiff Strauss or, at the very least, within the zone-of-interests the Lanham Act is intended to protect, as stated by the Supreme Court in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S 118 (2014). *Lexmark*, according to Plaintiff Strauss, eliminates the requirement that a defendant in a Lanham Act case be a direct competitor of the plaintiff. And, by extension, *Lexmark* also eliminates prong three of the *Proctor & Gamble* test for "commercial advertising or promotion"— i.e., a plaintiff is no longer required to plead or prove that the defendant's alleged representations were made for purposes of influencing consumers to buy the defendant's goods or services. The Court agrees *Lexmark* eliminates the threshold requirement that a plaintiff in a Lanham Act false advertising case be a direct competitor of the defendant, but declines to extend the *Lexmark* holding beyond its stated limitations to eliminate prong three of the *Proctor & Gamble* test.

The parties in *Lexmark* were not direct competitors. Lexmark manufactured and sold laser printers, as well as toner cartridges for those printers. *Lexmark*, 572 U.S. at 120. Static Control manufactured component parts which it sold to companies that competed directly with Lexmark in sales of replacement toner cartridges. *Id.* at 120-21. Static Control's Lanham Act false advertising claim against Lexmark was based on: (1) a statement printed on Lexmark's toner cartridge packages that led consumers to believe they were legally required to return used toner cartridges to Lexmark after a single use; and (2) letters sent to toner cartridge remanufacturers falsely advising them that it was illegal to sell refurbished toner cartridges and, in particular, to use Static Control's component parts in doing so. *Id.* at 122-23. Static Control alleged these misrepresentations "proximately caused and [we]re likely to cause injury to [Static Control] by diverting sales from [Static Control] to Lexmark," and had "substantially injured [its] business reputation . . . ." *Id.* at 123.

Lexmark challenged Static Control's standing to bring a Lanham Act false advertising claim arguing Static Control was not a direct competitor. The district court dismissed Static Control's Lanham Act claim for lack of "prudential standing" on the grounds that its injury was too remote—i.e., it was a mere byproduct of Lexmark's manipulation of consumers' relationships with cartridge remanufacturers. *Id.* at 123. The Sixth Circuit reversed the dismissal under a different standing analysis, concluding Static Control had "alleged a cognizable interest in its business reputation and sales to remanufacturers and sufficiently alleged that th[o]se interests were harmed by Lexmark's statements to the remanufacturer's . . . ." *Id.* at 124. The Supreme Court granted certiorari and concluded it was not a question of constitutional standing, but rather what class of plaintiffs Congress authorized to sue under the false advertising provision of the Lanham Act. That question was properly answered by considering two relevant background principles:

(1) "the zone-of-interest analysis, which asks whether 'this particular class of persons ha[s] a right to sue under this substantive statute"; and (2) "proximate causality." *Id.* at 125-134.

The Supreme Court considered the zone-of-interests protected by the Lanham Act and concluded that to come within the zone-of-interest protected in a suit for false advertising, "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 139. Proximate causality narrows that class of plaintiffs to those who can "show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 134. The Supreme Court concluded Static Control's alleged injuries of lost sales and damage to its business reputation were "precisely the sorts of commercial interests the [Lanham] Act protects" and because its position in the marketplace had been damaged by Lexmark's advertising, it was "within the zone-of-interests protected by the statute." *Id.* at 137. Static Control also sufficiently alleged proximate cause despite the absence of a direct competitor relationship. *Id.* at 138. "[W]hen a party claims reputational injury from disparagement, competition is not required for proximate cause[.]" *Id.*

The Supreme Court's decision in *Lexmark* did <u>not</u>, however, address whether Lexmark's alleged representations constituted "commercial advertising or promotion" sufficient to satisfy that element of a Lanham Act false advertising claim. In fact, the Supreme Court specifically noted that Lexmark contended "Static Control's allegations failed to describe 'commercial advertising or promotion' within the meaning of [the Lanham Act,]" but "[t]hat question [wa]s not before [the Supreme Court]" and it "express[ed] no view on it." *Id.* at 123 n.1. For purposes of its analysis, the Supreme Court "assume[d] without deciding that the communications alleged by Static Control qualif[ied] as commercial advertising or promotion." *Id.*

*Lexmark*, by its express language, does not address the propriety of the *Proctor & Gamble* test for determining whether a defendant's alleged representations constitute "commercial advertising or promotion." And in the wake of *Lexmark*, courts within the Tenth Circuit—and other Circuit Courts and district courts—have continued to apply the same test, with the exception of any express requirement that the parties be direct competitors. *See, e.g.*, *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256 (4th Cir. 2017) (adopting and applying all factors except competition requirement); *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 800-01 (6th Cir. 2015) (adopting all factors except competition requirement); *Wilson v. AdvisorLaw LLC,* 2018 WL 4932088, at *3-4 (D. Colo. Oct. 11, 2018) (applying *Proctor & Gamble* test post-*Lexmark*); *Gen. Steel Domestic Sales, LLC v. Chumley*, 129 F. Supp. 3d 1158, 172-73 (D. Colo. Sept. 15, 2015) (applying *Proctor & Gamble* test post-*Lexmark*); *In re Syngenta AG MIR 162 Corn Litigation*, 131 F. Supp. 3d 1177, 1221-27 (D. Kan. Sept. 11, 2015) (conducting separate *Lexmark* and *Proctor & Gamble* analyses and applying requirement that the defendant's representations be "for the purpose of influencing customers to buy defendant's goods or services" in the latter); *Neonatal Prod. Grp., Inc. v. Shields*, 2014 WL 6685477, at *12-13 (D. Kan. Nov. 26, 2014) (applying *Proctor & Gamble* test for "commercial advertising or promotion" post-*Lexmark*). Despite Plaintiff Strauss's contention, *Lexmark* did not overrule *Proctor & Gamble* or otherwise address the appropriate analysis for determining what constitutes "commercial advertising and promotion." And absent contrary authority from the Supreme Court, this Court is bound to apply Tenth Circuit precedent.

Turning to the test articulated in *Proctor & Gamble*, the dispositive question is whether Plaintiff Strauss's remaining Lanham Act claims are based on representations by Defendant that the Court could reasonably infer were made for the purposes of influencing customers to buy

Defendant's goods or services. As discussed *supra* Part III.B.1., Plaintiff Strauss's only Lanham Act claims that are not time-barred are those based on Defendant's 2016 Website Statements. Thus, the 2016 Website Statements are the only representations relevant to the Court's analysis. Specifically, Plaintiff Strauss alleges Defendant stated on its website that Plaintiff Strauss: (1) had no consumer ratings or reviews; (2) had not met Defendant's criteria to be listed on the website; and (3) had no local offers to extend consumers. These statements, even when considered in the light most favorable to Plaintiff Strauss, cannot be construed as having been made for purposes of influencing consumers to buy <u>Defendant's</u> goods or services—i.e., a consumer membership to Defendant's website or Defendant's advertising services. It is reasonable to infer that Defendant's 2016 Website Statements influenced consumers to purchase the goods or services of a tree care business other than Plaintiff Strauss, but that does not satisfy the *Proctor & Gamble* test.[16] Absent plausible allegations that Defendant's representations influenced consumers to buy Defendant's goods or services, Plaintiff Strauss cannot establish that those representations were made in connection with the commercial advertising or promotion of Defendant's goods or services. He

---

[16] Plaintiff Strauss does not contend the 2016 Website Statements were made by Defendant for purposes of influencing consumers to purchase Defendant's goods or services. He argues that, in a post-*Lexmark*-era, he is not required to show Defendant made the statements for that purpose because *Lexmark* removes the requirement that he be Defendant's "direct competitor." Secondarily, Plaintiff Strauss argues that, by collecting coupon retention percentages from other tree care businesses to whom it diverts business, Defendant "becom[es] a participant in th[ose] . . . tree care business[es]" that are direct competitors of Plaintiff Strauss. In support of this contention, Plaintiff Strauss urges the Court to consider the Ninth Circuit's holding in *Trafficschool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 1071-72 (9th Cir. 2011). Plaintiff Strauss contends *Trafficschool.com* held that companies in the business of collecting referral fees in exchange for connecting consumers with third-party service providers are in competition with other providers of those same services by the very act of collecting referral fees. Doc. 23 at 34. But *Trafficschool.com* states no such holding. The plaintiff and the defendant in *Trafficschool.com* <u>both</u> made money by connecting consumers with third-party service providers and, thus, the court found them to be competitors. *Trafficschool.com*, 653 F. 3d at 1071-72 (reversed in part on other grounds). Here, there is no contention that Defendant offers tree care services of the kind offered by Plaintiff Strauss or that Plaintiff Strauss offers goods or services similar in kind to those offered by Defendant. In any event, *Trafficschool.com* was a pre-*Lexmark* case discussing standing—an analysis which is supplanted by *Lexmark* but separate from *Proctor & Gamble*'s test for determining whether a defendant's representations constitute "commercial advertising and promotion." Plaintiff Strauss's arguments are relevant to a true *Lexmark*-based inquiry of "zone-of-interests" and "proximate causality." But those are not the elements of Plaintiff Strauss's Lanham Act false advertising claim that the Court analyzes and finds deficient under *Proctor & Gamble*.

has failed to establish an essential element of his remaining Lanham Act claims for false advertising and the allegations of his Original Complaint do not plausibly give rise to an entitlement to relief. Because Plaintiff Strauss has failed to plausibly allege an essential element of his remaining, timely Lanham Act claims, they are also dismissed.

### 2. Plaintiff Strauss's Remaining KCPA Claims

Like his remaining Lanham Act claims, Plaintiff Strauss's only timely KCPA claims are those based on the 2016 Website Statements. The upshot of Plaintiff Strauss's remaining KCPA claims, thus, is that Defendant violated the KCPA by making the following false representations on its website in 2016: (1) that Plaintiff Strauss has no ratings or consumer reviews; (2) that Plaintiff Strauss has not met certain criteria to be listed on Defendant's website; and (3) that Plaintiff Strauss has no local offers to extend to consumers. As noted above, Defendant seeks dismissal of these claims because Plaintiff Strauss has not plausibly pled the required elements of reliance or causation. The Court agrees with Defendant.

To recover under KCPA, a plaintiff must establish a causal connection between the alleged violation and the damages suffered. *Finstad v. Washburn Univ. of Topeka*, 252 Kan. 465, 474 (1993); *Rasnic v. FCA US LLC*, 2017 WL 6406880, at *8 (D. Kan. Dec. 15, 2017). "Plaintiffs generally demonstrate this causal connection through reliance on [the] defendant's misrepresentations." *Rasnic*, 2017 WL 6406880, at *8; *see also Jamieson v. Vatterott Educ. Ctr., Inc.*, 473 F. Supp. 2d 1153, 1157 (D. Kan. Feb. 9, 2007); *Prince v. Veterinary Specialty Emergency Ctr. of Kan. City, Inc.*, 195 P.3d 291 (Kan. Ct. App. 2008) (table).

Plaintiff Strauss has not alleged that he relied on the 2016 Website Statements to his detriment. To the contrary, he alleges he knew they were false or misleading in every respect; rather, he contends other consumers may have relied on the 2016 Website Statements to their detriment. Plaintiff Strauss has offered no authority—and the Court finds none—that reliance by

a third-party-consumer satisfies the "causal connection" requirement of a KCPA claim. Because Plaintiff Strauss has not plausibly pled an essential element of his remaining, timely KCPA claims, they are also dismissed.

## IV.  MOTION FOR LEAVE TO AMEND

The Court now turns to Plaintiff Strauss's request for leave to amend the Original Complaint. Defendant opposes the request, arguing it is futile because it does not address the deficiencies in Plaintiff Strauss's Lanham Act and KCPA claims as stated in the Original Complaint, rendering them subject to immediate dismissal even under the Amended Complaint. Defendant then argues Proposed-Plaintiff Garner's claims could not continue because the Court would lack personal jurisdiction over Defendant once Plaintiff Strauss was dismissed. The Court agrees.

### A.  Standard

Rule 15(a) governs the amendment of pleadings before trial. It provides that "[a] party may amend its pleading once as a matter of course [within twenty-one] days of service, or if the pleading is one to which a responsive pleading is required, [within twenty-one] days after service of a responsive pleading or [twenty-one] days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15(a)(1). All other amendments are permitted "only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.*

The decision to grant leave to amend a complaint after the permissive period, however, is within the trial court's discretion. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). The court may deny leave to amend upon a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or]

futility of amendment[.]" *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal quotations omitted)). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (internal quotations and citations omitted). Here, Plaintiff Strauss's proposed amendment is futile and the Amended Complaint would be subject to dismissal for several reasons.

### B. Futility of the Amended Complaint as to Plaintiff Strauss's Individual Claims

All of the factual allegations underlying Plaintiff Strauss's Lanham Act and KCPA claims in the Amended Complaint are identical to those in the Original Complaint. The Amended Complaint, therefore, does not—and cannot—alter the Court's conclusions as to: (1) Defendant's affirmative defenses of laches and statute of limitations; and (2) Plaintiff Strauss's failure to sufficiently plead one or more elements of his remaining, timely claims. If the Amended Complaint were allowed in its present form, Plaintiff Strauss's Lanham Act and KCPA claims would fare no better than under the Original Complaint. The only "new" claims in the Amended Complaint requiring additional analysis are those of Proposed-Plaintiff Garner. But, as is discussed *infra* at Part IV.C., upon dismissal of Plaintiff Strauss's individual claims the Court would lack personal jurisdiction over Defendant and could not reach the merits of Proposed-Plaintiff Garner's claims—rendering the Amended Complaint truly futile.

### C. Lack of Personal Jurisdiction over Defendant Absent Plaintiff Strauss

Upon dismissal of Plaintiff Strauss's individual claims under the Amended Complaint, the only remaining claims would be those of Proposed-Plaintiff Garner—a Maryland resident—against Defendant—incorporated in Delaware and domiciled in Indiana. In other words, the lawsuit would then be one by a foreign plaintiff against a foreign defendant. Defendant argues the

Court lacks jurisdiction to adjudicate Proposed-Plaintiff Garner's claims in the absence of Plaintiff Strauss. The Court agrees.[17]

A plaintiff bears the burden to establish personal jurisdiction over the defendant. *Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1179-80 (10th Cir. 2014). But in the preliminary stages of litigation, a plaintiff's burden to prove personal jurisdiction is light. *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). Where a trial court is asked to decide a pretrial motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff must make no more than a prima facie showing of jurisdiction. *Id.* at 1056–57. "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).

To defeat a plaintiff's prima facie showing of personal jurisdiction, the defendant "must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" Id. (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Where the defendant fails to controvert a plaintiff's allegations with affidavits or other evidence, the court must accept the well-pleaded allegations in the complaint as true, and resolve any factual disputes in the plaintiff's favor. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). In a federal question case, such as this one, a court can assert personal jurisdiction

---

[17] Plaintiff Strauss argues the Court has personal jurisdiction over Defendant because: (1) there are no federalism or state sovereignty concerns in cases involving putative class actions based on federal claims pending in a federal court; (2) there are no interstate sovereignty concerns in cases involving federal claims pending in federal court; and (3) the Court can exercise pendent jurisdiction over Defendant with respect to Proposed-Plaintiff Garner's claims because Defendant is subject to the Court's jurisdiction based on Plaintiff Strauss's claims. Doc. 50 at 11. Plaintiff Strauss, however, ignores: (1) the full extent of the personal jurisdiction analysis required by Tenth Circuit precedent in federal question cases; (2) the possibility that the Court would dismiss Plaintiff Strauss's individual claims and Proposed-Plaintiff Garner would be the only remaining plaintiff at the pre-certification stage; and (3) the fact that Defendant could not raise a personal jurisdiction defense that did not exist before Proposed-Plaintiff Garner was identified as a non-Kansas resident in the Amended Complaint.

over a defendant if: (1) the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant; and (2) the exercise of jurisdiction comports with due process. *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015).

Here, Proposed-Plaintiff Garner brings claims against Defendant under the Lanham Act. "[T]he Lanham Act does not provide for nationwide service of process[.]" *Advisors Excell, L.L.C. v. Am. Ret. Sys., LLC*, 2012 WL 10235348, at *2 (D. Kan. Dec. 11, 2012); *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2nd Cir.2004). Rule 4(k)(1)(A) thus governs service. *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (citing FED. R. CIV. P. 4(k)(1)(A)). Rule 4(k)(1)(A) requires the court to apply the law of the forum state where the district court is situated. *Id.*; *see also* FED. R. CIV. P. 4(k)(1)(A).

Courts construe Kansas's long-arm statute liberally to permit exercise of jurisdiction in every situation consistent with the United States Constitution. *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994); *see also* K.S.A § 60-308(b)(1)(L), -308(b)(2). Because of this liberal construction, a court need not conduct a separate personal jurisdiction analysis under Kansas law. *Dudnikov*, 514 F.3d at 1070. The "first, statutory, inquiry effectively collapses into the second, constitutional, analysis." *Id.*

The constitutional analysis requires a court to determine whether "exercis[ing] jurisdiction [is] in harmony with due process." *Id.* This is a two-step inquiry: (1) a defendant "must have 'minimum contacts' with the forum state, such that having to defend a lawsuit" in the forum, (2) "would not 'offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A plaintiff can satisfy the "minimum contacts" standard in one of two ways—by establishing general jurisdiction or specific jurisdiction based on a defendant's contacts with the forum state. *Rockwood Select Asset Fund*, 750 F.3d at 1179. The

Tenth Circuit has delineated the differences in general jurisdiction and specific jurisdiction as follows:

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state and does not require that the claim [at issue] be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a quid pro quo: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

*Dudnikov*, 514 F.3d at 1078 (citations omitted).

### 1.    No General Jurisdiction

Plaintiff Strauss does not appear to argue that the Court has general jurisdiction over Defendant, but for the sake of clarity, the Court addresses the issue. The Court lacks general jurisdiction over Defendant because Defendant is not "at home" in Kansas under binding Supreme Court precedent.

The Supreme Court recently clarified that general jurisdiction exists only when the defendant's "affiliations with the [forum state] are so continuous and systematic as to render [it] essentially at home in the forum [s]tate." *Daimler AG v. Bauman, et al.*, 571 U.S. 117, 754 (2014) (internal quotations and citations omitted). "Continuous activity" by a corporation in the forum is not enough. *Id.* at 757. For a corporation, "the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction." *Id.* at 760 (internal quotations and citations omitted). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as being easily ascertainable." *Id.*

Defendant is not "at home" in Kansas because it is not incorporated in Kansas and does not have its principal place of business in Kansas. The Amended Complaint—which is the operative complaint for purposes of considering the futility of Plaintiff Strauss's request for leave to amend—alleges that Defendant is incorporated in Delaware and has its principal place of

business in Indiana. Doc. 43-1 ¶ 4. A mere allegation that Defendant is licensed to do business and, in fact, does business in Kansas—i.e., is engaged in continuous activity in Kansas—is not enough for the Court to conclude Defendant is "at home" in Kansas. The Supreme Court's holding in *Daimler* controls and there is no basis for general jurisdiction over Defendant.

### 2.    No Specific Jurisdiction

Absent general jurisdiction, Proposed-Plaintiff Garner cannot proceed on his claims against Defendant unless there is specific jurisdiction. A court may exercise specific personal jurisdiction if: (1) the out-of-state defendant "purposefully directed" his activities at residents of the forum state; and (2) the plaintiff's injuries arose from those purposefully directed activities. *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013). Proposed-Plaintiff Garner cannot meet the second prong of this specific jurisdiction analysis.[18]

Under the well-pleaded allegations of the Amended Complaint—again, the operative complaint for purposes of this analysis—Proposed-Plaintiff Garner's alleged injuries did not arise out of Defendant's activities directed at residents in Kansas. Proposed-Plaintiff Garner is a resident of Maryland and that is where he engages in the roofing business. Doc. 43-1 ¶ 2, 56. Proposed-Plaintiff Garner does not allege he does business in Kansas or that he engaged Defendant's advertising services for the purposes of seeking customers in Kansas. *Id.* ¶¶ 56-74. Neither does he allege that any of his dealings or interactions with Defendant occurred in Kansas. *Id.* Defendant is not incorporated in Kansas and does not have its principal place of business in Kansas. *Id.* ¶ 4. There are no allegations supporting even a prima facie showing that Proposed-Plaintiff Garner's

---

[18] Plaintiff Strauss suggests that federal courts considering claims arising under federal law have nationwide jurisdiction regardless of whether the plaintiff's damages arise from the defendant's activities within the forum state. This ignores binding Tenth Circuit precedent requiring the second step of the analysis where, as here, the federal statute conferring subject matter jurisdiction does not include a specific statutory provision permitting nationwide service of process. *Dudnikov*, 514 F.3d at 1070; *Newsome*, 722 F.3d at 1264.

alleged damages arise out of Defendant's activities in Kansas. The fact that Defendant may have had similar dealings with Plaintiff Strauss—or other service providers—in Kansas does not equate to a showing that Proposed-Plaintiff Garner's damages actually arise out of those interactions. Absent such a showing, the Court cannot exercise specific jurisdiction over Defendant with respect to Proposed-Plaintiff Garner's claims, rendering the Amended Complaint entirely futile.

## V.      CONCLUSION

For the above reasons, Plaintiff Strauss's claims under the Original Complaint are dismissed either as time-barred or for failure to plausibly allege at least one essential element of each claim. Because the Amended Complaint does not address these deficiencies, it is futile and would be subject to immediate dismissal, leaving the Court no jurisdiction to adjudicate the claims of Proposed-Plaintiff Garner.

THE COURT THEREFORE ORDERS that Defendant's Motion to Dismiss Plaintiff's Class Action Complaint (Doc. 11) is GRANTED.

THE COURT FURTHER ORDERS that Plaintiff Strauss's Motion for Leave to File First Amended Complaint (Doc. 43) is DENIED.

IT IS SO ORDERED.

DATED:  November 1, 2018                    */s/ Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE